**In re Anonymous No. 42 D.B. 74**

Disciplinary Board Docket no. 42 D.B. 74.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

DANIELS, *Member,* November 12, 1979—Pursuant to Rule 218(c)(5) of the Pennsylvania Rules of Disciplinary Enforcement (rules), the Disciplinary Board of the Supreme Court of Pennsylvania (board), submits its following findings and recommendations to your honorable court with respect to the above petition for reinstatement.

## I. HISTORY OF PROCEEDINGS

On April 2, 1973, the Court of Common Pleas of [ ] suspended petitioner from the practice of law for three years. The violations for which petitioner was suspended encompassed improper solicitation with respect to 16 charges, submitting inflated and fraudulent medical claims in 15 charges, submitting false information to the court of common pleas and attempting to impede the special judicial investigation with respect to five charges. The order of suspension of the Court of Common Pleas of [ ] County was affirmed by the Supreme Court of Pennsylvania, with petitioner's three-year suspension becoming effective on November 15, 1974.

In the interim, on October 19, 1973, petitioner had pleaded nolo contendere to two counts of Federal income tax evasion before the United States District Court, as a consequence of which he was sentenced to two concurrent three-year suspended prison terms and was fined. On the basis of such pleas, another disciplinary proceeding was initi-

ated against petitioner, which resulted in hearing committee [   ] recommending, on June 26, 1975, that petitioner be suspended from the practice of law for an additional nine months, beyond his original three-year suspension. The Supreme Court of Pennsylvania, however, directed that this recommended additional nine-month suspension period run concurrently, rather than consecutively, with the original three-year period of suspension that it had previously imposed. Implicit in the imposition of this nine-month additional concurrent suspension, rather than consecutive suspension, was the judgment of the Supreme Court of Pennsylvania that a total suspension from the practice of law for a period of three years was sufficient punishment for all of the rather serious violations of the Code of Professional Responsibility that had been committed by petitioner, all of which were specifically articulated in the two disciplinary proceedings referred to above and all of which were before the Supreme Court at the time that it imposed the additional nine-month concurrent suspension period. Accordingly, none of petitioner's professional misconduct prior to June 26, 1975, should have been considered by hearing committee [   ] nor may it be considered by this board, in making a determination on the instant petition for reinstatement.

The instant petition for reinstatement was filed by petitioner on November 15, 1977, and after withdrawing the same without prejudice due to an illness in petitioner's family, petitioner again filed his petition for reinstatement on January 13, 1978. Pursuant to the provisions of Rule 218(2) of the Pennsylvania Rules of Disciplinary Enforcement, the board referred the matter to hearing committee [   ]. The duties of disciplinary counsel were per-

formed by [ ], Esq., and petitioner was represented by [ ], Esq.

Following appropriate notice, the committee held hearings on May 17, 1978, May 19, 1978 and May 31, 1978. After the submission of briefs, the committee filed its report and recommendation wherein it recommended that the petition for reinstatement be denied. Petitioner filed exceptions to the committee's report and briefs were filed by petitioner and disciplinary counsel. On May 24, 1979, oral argument was held before a three-member panel of this board. For the reasons hereinafter set forth the board, after having heard argument and having conducted a thorough and exhaustive review of the entire record, including the report of the committee, hereby recommends that the petition for reinstatement be granted.

## II. DISCUSSION

Petitioner has the burden of demonstrating by clear and convincing evidence that he has the moral qualifications and the competency and learning in law required for admission to practice in this Commonwealth. In addition, he must prove that his resumption of practice will be neither detrimental to the integrity and standing of the Bar or the administration of justice or subversive of the public interest: Rule 218(c)(3)(i) of the Pennsylvania Rules of Disciplinary Enforcement. We are satisfied that petitioner has met this burden.

Regarding moral qualifications, petitioner produced six character witnesses. All testified as to his high standing and excellent reputation in the community. At the time of the committee's hearings, petitioner, who has been active in his

synagogue since 1968, held the office of [ ] of his congregation, [ ]. The congregation did not object to the appointment of petitioner to high office and in fact the congregation's executive council unanimously chose petitioner for such office.

Petitioner has been honored by his fellow congregants with a specially created award for both the quality and extent of his service to the religious community. In addition, petitioner has been very active in the Jewish National Fund, acting as liaison among and between synagogues in the area. Though petitioner's suspension from the practice of law was known to his fellow congregants, the congregation, nonetheless, had no reluctance or hesitation in placing him in positions of trust and responsibility. A review of the entire record reveals that petitioner has continued to cohabit with, remain responsible to, be loyal to and support his wife and children, even in the face of tremendous adversity. Finally, it is of moment to note that hearing committee [ ] which in fact recommended the imposition of an additional period of suspension following petitioner's pleas of nolo contendere, was so favorably impressed with petitioner as an individual and as a professional man, even in the face of his professional misconduct, that it made a special note of its impression of petitioner's character.[1]

---

1. In that connection, hearing committee [ ] stated:

"We were deeply impressed with respondent as an individual. His demeanor, his articulateness, his genuineness, his sense of professionalism and dignity was very evident. In that connection we had more than the usual opportunity to make these judgments. His counsel was unavoidably detained for two hours, prior to the start of the first hearing. While we had no discussion with [Respondent] on the merits of his claim, we did

The instant committee [ ] chose to give little weight to the reputation evidence submitted in support of the instant petition for reinstatement, on the ground that the character witnesses were petitioner's long-standing friends. Further, the committee supported its position in this regard with a discussion which concluded that friends may be complacent, accommodating and unable to appreciate the necessity of protecting the public interest. Although as a general rule that statement is true, it has absolutely no applicability or foundation in the record that is presented in the instant proceeding.

Two attorneys, each having practiced law for 20 years, testified on behalf of petitioner. One witness was a Ph.D. in chemistry, who is presently attending law school, and a fourth character witness was petitioner's rabbi. An insurance broker and businessman also appeared as character witnesses on behalf of petitioner. In light of the standing in the community of each of these individuals, who stake their own background and reputation in testifying as to the good character and reputation of petitioner, it is not reasonable to conclude that these

---

have an opportunity to evaluate respondent in a non-adversary setting and were very favorably impressed by his potential to carry on the obligations of our profession, albeit at some point in the future. This favorable impression remained throughout the hearings. This record will not afford the reviewing body the unique opportunity we had to evaluate the individual, so we feel obliged to make special note of our observations respecting [Respondent's] character in light of the role that it plays in our recommendation. Similarly we were impressed by the fact that 27 character witnesses testified after having waited two hours until six o'clock. That most were attorneys confirms our own view of [Respondent's] character."

intelligent and independent men of standing in the community would be either complacent, accommodating or unappreciative of the public interest. It appears that the committee would place petitioner between Scylla and Charybdis. Petitioner is criticized for calling long-standing friends to testify as to his reputation in the community, but would, undoubtedly, be open to more severe and, perhaps, justifiable criticism if he called new-found acquaintances, unfamiliar with petitioner's reputation and previous suspension from the practice of law, in support of the instant petition for reinstatement. Accordingly, the board's review of the evidence leads fairly and reasonably to the conclusion that petitioner does possess and has demonstrated the moral qualifications necessary to resume the practice of law in the Commonwealth of Pennsylvania.

As to competency in the law, petitioner graduated from an accredited law school and was admitted to the Bar in [ ]. Since early 1976, he has been employed by a law firm whose practice includes personal injury matters, commercial work and mortgage foreclosures. Petitioner's employer subscribes to and receives, among other publications, the Atlantic Reporter, District and County Reports, the A.T.L.A. Journal and the Pennsylvania Law Reporter. The uncontradicted evidence proves that petitioner reads all such publications to keep abreast of current developments. It is of no consequence that he personally did not subscribe to legal publications, since the law was available to and read by petitioner in the law office in which he was regularly in attendance.

During the course of petitioner's cross-examination, the committee correctly refused to permit hypothetical questions to be put to petitioner. When

asked, however, to discuss Pennsylvania's law on comparative negligence, petitioner responded fully and correctly. The record, in fact, fails to reveal any incorrect answers to any proper questions presented to petitioner. Interestingly enough, the committee stated that, as unfamiliar legal questions would come up, petitioner, as all other attorneys, would have the ability to research the law and educate himself as to the same.

In concluding our discussion of the legal competency requirement, this board must point out that the committee found only that petitioner did not personally subscribe to legal publications and on that finding alone concluded that there was a lack of legal competence on the part of petitioner. We cannot agree with such a patently erroneous factual finding. Many hundreds, indeed thousands, of practicing attorneys working for law firms do not have individual and personal subscriptions to legal journals. So long as the law is available and read, as it was in this instance, there is no requirement, in law or in reason, for personal subscriptions. We find, therefore, that petitioner is sufficently competent and learned in the law to resume the practice of law in the Commonwealth of Pennsylvania.

In its report, the committee made 56 findings of fact. Most of those findings are unsupported by the evidence. As an arm of the Supreme Court, this board has the duty to conduct a de novo review of the record: Matter of Leopold, 469 Pa. 384, 366 A. 2d 227 (1976), and Office of Disciplinary Counsel v. Campbell, 463 Pa. 472, 345 A. 2d 616 (1975). Further, the board must not hesitate to overturn unsubstantiated findings and recommendations: Berlant Appeal, 458 Pa. 439, 328 A. 2d 471 (1974).

The committee's findings of fact fall into three general categories as follows: (1) petitioner's

referral of cases to and association with the law firm of [A and B]; (2) petitioner's Federal income tax returns and alleged misrepresentations on his reinstatement questionnaire; and (3) miscellaneous matters which were the subject of the special judicial investigation leading to petitioner's initial three-year suspension.

## (1) Referral of Cases

There was, at the various hearings, extensive testimony regarding petitioner's referral of cases to and association with the law firm of [A and B]. The committee concluded that petitioner referred a number of files to the above law firm due solely to the notoriety surrounding petitioner's name upon the commencement of the special judicial investigation against him. Such findings are not supported by the record. In fact, although petitioner was not suspended from the practice of law until April 2, 1973, on June 1, 1972, he referred his files to [B]:

". . . solely out of a desire to protect you [the client] and to see that your case is brought to a successful conclusion as quickly as possible . . ."[2]

Also, the committee made much of the fact that petitioner referred his cases to the firm of [A and B], though [A] was the subject of the special judicial investigation. The evidence unequivocally proves, however, that the files were referred to [B] who was

2. As a matter of further importance in this regard is the report of hearing committee [   ] which was filed on June 26, 1975, following petitioner's nolo contendere pleas, wherein petitioner was lauded for having voluntarily deprived himself of the right to practice law long prior to his suspension, in recognition of the fact that such referrals arose out of petitioner's desire to protect his clients.

never the subject of any disciplinary investigation at any time, and not to [A]. Petitioner never referred any cases to [A] personally.

A review of the evidence shows that the fee arrangement between [B] and petitioner was proper in all respects. First, petitioner specifically advised his clients that they would incur no additional fees or expenses because of the referral. In addition, petitioner reviewed each file with [B] upon referral, at which time it was concluded that in the overwhelming majority of the files petitioner's work product input was well in excess of 50 percent. It was on this basis that the 50 percent referral arrangement was struck. The fee agreement contained the additional proviso that if, at the conclusion of each case, it was [B]'s opinion that the work which he had performed was greater than had been originally estimated, then petitioner's fee for legal services rendered would be reduced accordingly. Such reductions were made both as a result of [B]'s work and as a result of certain files being referred to a third attorney. On the basis of the foregoing, it was factually incorrect for the committee to have concluded that petitioner failed to properly advise his clients of the fee arrangements upon referral of their matters or that petitioner's fee sharing arrangement with [B] was in any way improper.

Moreover, the committee's conclusion that petitioner failed to notify his referred clients of his suspension from the practice of law raises an illusory issue. It was in early June, 1972, at which time petitioner voluntarily divested himself of most of his existing case files, upon his referral of said files to [B]. This, at a point in time some ten months prior to his actual suspension by the Court of Common Pleas of [ ] County on April 2, 1973. Accordingly, at the time of such referrals, petitioner, still being

licensed to practice law in the Commonwealth of Pennsylvania, was under no duty to advise those clients referred to [B] in June of 1972 of his suspension from the practice of law, under Supreme Court Rule 17-17 (see now Rule 217 of the Pennsylvania Rules of Disciplinary Enforcement). Rule 17-17 required a formerly admitted attorney to advise all clients of his suspension. Once petitioner's clients were referred to [B] in June of 1972, such clients were thereafter clients of [B] and not of petitioner; accordingly, it was unnecessary for petitioner to advise former clients of his suspension when it in fact occurred in April of 1973. As a matter of fact, the record clearly discloses that after petitioner's suspension by the Court of Common Pleas of [   ] County on April 2, 1973, petitioner did in fact direct letters, dated April 11, 1973, to some of his few remaining clients, pursuant to Supreme Court Rule 17-17, advising that he had been suspended, was no longer able to practice law and that they [his clients] should seek other legal representation. A form of such letter was in fact appended to the instant petition for reinstatement, but for some unknown reason was never considered by or referred to by the committee in its report and recommendations. Accordingly, it is clear that at that point in time when petitioner had in fact become a "formerly admitted attorney," within the definition of Supreme Court Rule 17-17, he complied with the mandate of such rule in giving notice of his suspension to his then existing clients. Therefore, the committee's Finding of Fact No. 13 is without merit.

It is necessary to directly address those findings and conclusions which attempt to intimate that petitioner practiced law after his suspension. In this

regard, it is important to remember that petitioner was duly licensed to practice law until April 2, 1973. Also crucial to this determination is the fact that disciplinary counsel does not directly charge petitioner with engaging in the practice of law after his suspension, but rather attempts to create that impression by hinting of alleged discrepancies between his reinstatement questionnaire and petitioner's testimony before hearing committee [  ] in 1975 as to the date on which he ceased his practice of law. A careful study of the entire record reveals that there is no such discrepancy. As a matter of fact, disciplinary counsel, when questioned by the three-member panel of this board at oral argument on May 24, 1979, conceded, *unequivocally,* that there was absolutely no question but that petitioner had not engaged in the practice of law in any way whatsoever, in contradiction of his suspension by the Supreme Court of Pennsylvania, since the date that the suspension became effective, on November 15, 1974, and up to and including the date of that oral argument. Moreover, the committee made no factual finding, nor is there any record evidence of any kind, indicating that petitioner did anything improper with respect to the unauthorized practice of law in connection with the activities that he has performed at the law offices of [A and B] since he commenced his employment with that firm in December, 1975, and up to and including the present time.[3]

---

3. Lest there be any confusion, it should be noted that the committee's Finding of Fact No. 18 to the effect that petitioner has worked full time for the [A] firm since 1975 is incomplete. While petitioner has been so employed, he has not been and does not practice law in such employment capacity.

There remains the issue of petitioner's request for an advisory opinion regarding his employment with [A and B], which commenced in December, 1975, or thereabouts. By letter dated January 8, 1976, petitioner, referring to a telephone conversation of January 7, 1976, with his counsel, asked such counsel to obtain an advisory opinion as to the duties petitioner might perform in a law office during the period of his suspension from the practice of law. Petitioner's counsel thereafter requested such an advisory opinion from chief disciplinary counsel in early February, 1976. Chief disciplinary counsel's reply letter of February 17, 1976, in response to petitioner's counsel's request for an advisory opinion did not really contain an advisory opinion, but instead referred petitioner's counsel to certain reported decisions with respect to when a suspended attorney could resume work in another lawyer's office and what the nature of that work and the extent of his duties could be. It was on the basis of that information received that petitioner's counsel felt it permissible for petitioner to perform his duties as a paralegal at the offices of [A and B], which duties petitioner has continued to perform since early 1976 and up to and including the present time.

Although the advisory opinion was not sought until after petitioner had in fact commenced his employment, it is equally clear from a review of the record that petitioner undertook duties merely as a bookkeeper at the offices of [A and B] until such time as his counsel advised him that he [petitioner] could broaden the scope of his duties and actually engage in the activities of a paralegal. In further contradiction of the committee's findings, the evidence establishes that petitioner not only read the

letter and opinion of chief disciplinary counsel with its enclosures, but also sought the advice of his counsel.[4]

### (2) Federal Income Tax Returns and Reinstatement Questionnaire

The next area that deserves clarification involves petitioner's Federal income tax returns. Prior to filing the present petition, petitioner asked his accountant, a certified public accountant, to review all tax returns. In the course of that review, petitioner's accountant discovered that his office, not petitioner, had made a mistake in failing to report all of petitioner's income for 1974. Since this was the accountant's error, the accountant, not petitioner, paid the interest resulting from this deficiency. This deficiency then was not the fault of petitioner and consequently does not reflect adversely upon his character or reflect unfavorably upon his honesty or integrity.

Disciplinary counsel questioned petitioner at length regarding his 1975 and 1976 Federal income tax returns. It is clear, however, that petitioner is not an accountant, did not prepare the returns and did not have before him the underlying work sheets. While the work sheets were produced by the accountant, the accountant was questioned only briefly with respect thereto by disciplinary counsel. Disciplinary counsel inquired into a number of specific matters respecting petitioner's Federal in-

---

4. As to petitioner's name and address appearing in the [    ] Directory, the record reveals no evidence that petitioner took affirmative steps to list his name after suspension, but demonstrates that on at least three occasions he asked that his name be deleted from the same.

come tax returns at the time of the hearings before the committee. Suffice it to say that each and every item and deduction about which inquiry was made had been originally handled and determined by petitioner's accountant, who rendered his professional opinion to petitioner with respect to the inclusion or deduction of these items in petitioner's various Federal income tax returns. The record fails to reveal any professional opinion to the contrary. Whatever technical mislabeling of deductions there was in Federal income tax returns was, therefore, the responsibility of petitioner's accountant and not of petitioner himself. Moreover, the fact remains that no matter in what category the total amount of petitioner's various deductions from income appeared, the amount of net taxable income that petitioner reported in each of said years remained the same. This is also true regarding whatever deductions of petitioner's wife were placed on his own Schedule C, since petitioner and his wife did in fact file joint Federal income tax returns.

It is not true that petitioner understated his income for 1975. Some months prior to the committee's first hearing, disciplinary counsel questioned petitioner on this matter. Petitioner did in fact discuss the matter with his accountant and an explanation was provided to disciplinary counsel. The record shows that the accountant netted out certain deductions from income, each and every one of which were legitimate, proper and accounted for. Any questions that disciplinary counsel had with respect to the manner in which petitioner's income and deductions were handled on his various Federal income tax returns should have been directed

to petitioner's accountant, therefore, and not to petitioner.

In that regard, this board fails to comprehend why disciplinary counsel, after receiving entirely satisfactory answers to the numerous questions that were directed to both petitioner and his accountant at the committee's hearings regarding petitioner's Federal income tax returns, prepared, and the committee adopted, findings of fact which contained language from the questions asked, but no information from the answers given. The record discloses that petitioner's Federal income tax deductions for automobile, travel and office expenses were entirely proper and professionally advised by petitioner's accountant.

Similarly, a careful study of the record does not disclose that petitioner made any misrepresentations in his reinstatement questionnaire, either with respect to his wife's being 100 percent financially dependent upon him, or in connection with his business association with one [C]. In connection with that latter finding, it must be noted that the reinstatement questionnaire required that petitioner disclose his "various occupations" during the period of his suspension or disbarment. Petitioner testified that he did not consider his association with [C] an occupation in the usual sense and, consequently, did not list [C]'s name in the reinstatement questionnaire. While various dictionaries provide varying definitions of the word "occupation," this board will not engage in semantic or metaphysical arguments. The facts are that petitioner and [C] were not partners, were not incorporated and had no employment contract. Rather, they were exploring the possibilities of

identifying a business they might form.[5] Such unborn expectations do not constitute an occupation and petitioner was justified in so concluding. Accordingly, there was no misrepresentation in the reinstatement questionnaire with respect to petitioner's activities with [C].

Moreover, we find no support for the contention that petitioner misrepresented his wife's 100 percent financial dependency upon him in his reinstatement questionnaire. The reinstatement questionnaire indicates that petitioner's wife was 100 percent financially dependent upon him. Although petitioner's and his wife's joint 1976 Federal income tax return shown that petitioner's wife had an income of approximately $5,000 and their 1977 return shows that she had an income of approximately $6,500, petitioner, nonetheless, testified, in response to disciplinary counsel's question, that the information contained in the reinstatement questionnaire was still correct. Upon questioning by the three-member panel of this board at oral argument on May 24, 1979, disciplinary counsel readily admitted that neither petitioner nor his wife were ever asked, at any of the hearings, whether petitioner's wife's income was used to defray her living or maintenance expenses or any of the expenses of their home together. As a matter of fact, the record is totally devoid of any information with respect to the disposition of peti-

---

5. As to the relationship of petitioner and [C], petitioner testified:

"We were interested in associating with each other in some form of business activity or in the alternative finding opportunities that might be acceptable to other people so that we can again accept finder's fees for our efforts."

tioner's wife's income in the years in question. One could speculate that the income was used by petitioner's wife for her own support; on the other hand, one could also speculate that the income was used for some other expense or put into a separate savings account. However, in the face of the record before us, this board cannot sanction a finding of a material misrepresentation by petitioner in his reinstatement questionnaire so as to render him unfit to practice law in this Commonwealth on the basis of so speculative a matter.

### (3) Miscellaneous Matters

Three further matters relating to the special judicial investigation require comment. The first relates to a motor vehicle accident involving one [D] on May 9, 1970. That matter was settled and the case closed in November, 1970, by petitioner. In 1973, that case was investigated by a three-judge panel. [D] was involved in a subsequent accident on July 5, 1970, and that matter was likewise examined by the special judicial investigation. Petitioner was never charged with unethical conduct regarding that latter matter. Petitioner has been severely punished as a result of the first [D] case and was not guilty of any wrongdoing regarding the latter. Both cases predate petitioner's suspension and have no connection whatsoever with petitioner's conduct since his suspension. Since both of these matters were considered and disposed of prior to the imposition of discipline upon petitioner, they are irrelevant to the issues before this board in connection with the instant petition for reinstatement.

The same is true with respect to the [E] matter. Moreover, any professionally improper conduct in which petitioner may have engaged prior to his

suspension, for which he has been previously disciplined, and disciplined most severely by virtue of a three-year suspension from the practice of law, is not a matter for consideration in connection with the instant petition for reinstatement. Petitioner has paid his penalty and if our disciplinary system is to encourage hope for rehabilitation and the return to the practice of law, then petitioner has most assuredly qualified for the grant of his instant petition for reinstatement.

## III.  RECOMMENDATION

For all of the reasons set forth above, the Disciplinary Board respectfully recommends that the instant petition for reinstatement of [Respondent] should be granted by your honorable court and that the court direct that the necessary expenses incurred by this board in the investigation and processing of the instant petition for reinstatement be borne and paid by petitioner.

Messrs. Anderson and McDonnell did not participate in the adjudication.

## ORDER

EAGEN, *C.J.*, And now, January 11, 1980, the recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania dated November 12, 1979, is rejected and the petition for reinstatement is denied.

The expenses incurred by the board in the investigation and processing of the petition for reinstatement shall be paid by the petitioner.

Mr. Justice Larsen and Mr. Justice Flaherty dissent.