366 A.2d 227

**In the Matter of Marx S. LEOPOLD.**

Supreme Court of Pennsylvania.
Submitted Sept. 21, 1976.
Decided Nov. 24, 1976.

Marx S. Leopold, pro se.

Charles F. Lieberman, Harrisburg, for respondent Disciplinary Bd.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

JONES, Chief Justice.

This matter is before this Court on direct review [1] of a recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania that petitioner, Marx S. Leopold, be disbarred from the practice of law for professional misconduct involving *inter alia* [2] a violation of

1. We hear this appeal pursuant to the authority of Pa.Sup.Ct.R. 17–8(c). Petitioner requested allowance for oral argument, which request was granted by Order of June 7, 1976. Argument before this Court was scheduled for September 21, 1976. On the morning of September 21, 1976, prior to the scheduled argument, petitioner orally advised the Prothonotary's Office of the Supreme Court that he was waiving oral argument and would submit his case by brief.

2. The Disciplinary Board of the Supreme Court of Pennsylvania approved the findings of the Hearing Committee that petitioner violated the following Rules of the Code of Professional Responsibility:
    (1) DR 1–102(A)(3)—A lawyer shall not engage in illegal conduct involving moral turpitude.
    (2) DR 1–102(A)(4)—A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
    (3) DR 1–102(A)(6)—A lawyer shall not engage in any other conduct that adversely reflects on his fitness to practice law.
    (4) DR 9–102(B)(4)—A lawyer shall promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

Disciplinary Rule 9–102(B)(4) of the Code of Professional Responsibility.[3]

The relevant facts of this case are not contested. In 1967, the petitioner was retained by Joseph Pofit in a matter concerning a corporation known as P. J. Hydraulics, Inc., in which Pofit had been an officer and major stockholder. In connection with his engagement as attorney for Pofit, three checks were delivered to petitioner: one in July 1967 for one hundred dollars ($100.00); one in August 1967 for four hundred dollars ($400.00) and one in September 1967 for five thousand and five hundred dollars ($5,500.00). All three checks were from Pofit's personal account and drawn on a local bank. The $100.00 and $400.00 checks were paid to petitioner as attorney's fees in connection with his representation of Pofit. The $5,500.00 check was to be held by the petitioner in escrow, and to be used by him, if necessary, to settle potential claims of P. J. Hydraulics, Inc., against Pofit.[4] The $5,500.00 check was deposited in petitioner's

---

**3.** Adopted by the Supreme Court of Pennsylvania on February 27, 1974. Effective February 27, 1974.

**4.** *Mr. Pofit's uncontradicted responses under direct examination before Hearing Committee 3.01 of the Disciplinary Board of the Supreme Court of Pennsylvania clearly indicates the nature of the transaction which he engaged petitioner to undertake in his behalf with respect to the $5,500.00:*

"Q Did you have occasion to retain Mr. Leopold's services *as an attorney in 1967?*

A Yes, I did.

Q And for what purpose, sir?

A I had parted company with a company that I had been operating. I was a major stockholder and so forth. And there was some unpleasantness, as I expected, over settling our accounts.

And I wanted to settle the accounts before anything transpired. And to do it on my own volition.

Q What arrangements, if any, did you make with Mr. Leopold in this regard?

A I told him to contact them, that I had figured that I had a debt to straighten out. I felt that I owed them some money.

I wanted them to let me come forth and negotiate it with them, let me have access to their records and I would find out exactly what was necessary to clear the debt."

escrow account in the Harrisburg National Bank (presently the Commonwealth National Bank).

Between the time of delivery of the $5,500.00 check to petitioner in September of 1967 and October 1, 1974, there was no meaningful communication between the petitioner and Mr. Pofit. With respect to the potential claims of P. J. Hydraulics, Inc., petitioner did virtually nothing for his client.[5]

On September 13, 1967, the day following the deposit of the $5,500.00 check into petitioner's escrow account, the balance of that account fell below $5,500.00. Approximately four months later, January 3, 1968, the balance of the escrow account had declined to $232.94 and by July 31, 1976, to a balance of $30.93. Beginning in October of 1974, after he realized that P. J. Hydraulics, Inc., was no longer asserting a claim, Mr. Pofit made several demands upon the petitioner for the reurn of the $5,500.00, or as much of that sum as had not been utilized in connection with the negotiations with P. J. Hydraulics, Inc. Pofit wrote to petitioner on November 5, 1974, requesting the return of the entrusted funds, but received no reply to this letter. Then located outside the city of Harrisburg, Pofit engaged the services of Attorney James W. Sanderson of Albany to represent him in recovering the funds still in the possession of petitioner.

Transcript of Proceedings Before Hearing Committee, 3.01, Disciplinary Board Docket No. 47 DB 75, September 26, 1975, pp. 9, 10 (filed October 23, 1975).

5. Mr. Leopold was permitted to make an oral statement before the Hearing Committee which in relevant part reads:

"I never was informed by anybody at P & J Hydraulics that there was any claim. I made a—to the best of my recollection —an inquiry with them as to whether or not they were concerned with Mr. Proffit [sic].

I really don't remember them showing any concern at all. As a matter of fact, I am not really sure that I got any reply of substance at all."

Transcript of Proceedings Before Hearing Committee 3.01, Disciplinary Board Docket No. 47 DB 75, October 6, 1975, pp. 6–7 (filed October 23, 1975).

Attorney Sanderson wrote two letters to petitioner, one on December 2, 1974, and the other on January 2, 1975. Petitioner failed to reply to the December 2 letter, but did send a brief telegram on January 13, 1975, to Attorney Sanderson in response to the January 2 letter.[6] Attorney Sanderson also made numerous telephone calls to petitioner, which were to no avail.

In April of 1975, Attorney Sanderson referred the matter to Herbert G. Rupp, Jr., Esquire, a member of the Dauphin County Bar. Attorney Rupp's attempts to reach petitioner by telephone at his office were unsuccessful. On April 28, 1975, Attorney Rupp sent a letter by registered mail to petitioner in which he demanded the return of Mr. Pofit's money. Petitioner received this letter, but neglected to make any response.

Subsequently, Mr. Pofit, through Attorney Rupp, filed a civil action [7] in the Court of Common Pleas in Dauphin County, Pennsylvania, to recover the funds improperly retained by petitioner. Through this proceeding a judgment by default was obtained by Mr. Pofit against the petitioner. To date, the petitioner has made neither restitution to his former client, nor any effort toward that end.[8]

6. The telegram read as follows:
"RECEIVED YOUR COMMUNICATION CONCERNING POFIT ACCOUNT. YOU WILL RECEIVE CHECK BY JANUARY 21, 1975.
MARX LEOPOLD"
No money was ever received by Mr. Pofit from the petitioner.

7. *Pofit v. Leopold,* C.P. No. 1039, June Term (Pa., filed August 8, 1975).

8. The following colloquy which occurred before the Hearing Board between Mr. Lieberman, Disciplinary Counsel, and Mr. *Leopold, petitioner, concerning restitution, is demonstrative of the* unprofessional and irresponsible attitude which this petitioner has maintained with respect to the transgression of his client's interests and his duty to the courts of this Commonwealth:
"Q Mr. Leopold, you did in 1967 deposit that money in an escrow account, didn't you?
A Yes.
Q Around July, August or September, I believe it was.

A   Yes.

Q   And, it was shortly after that that you started to take the money out for purposes other than that of Mr. Poffit [sic]. Isn't that correct?

A   That is correct.

Q   What did you use Mr. Poffit's [sic] money for, Mr. Leopold?

A   Well, I didn't use it for Mr. Poffit [sic].   What I used it for, I really can't say at this point.

Q   You testified that we should keep in mind here, the fact that braverment [sic] of this complaint occurred in 1967 and thereafter, when the money was taken out.   Isn't that correct?

A   That is what I said.

Q   Have you paid the money back yet, Mr. Leopold?

A   No, I have not.

Q   You were served with a letter from this office, I believe it was back on May 30, informing you that the Disciplinary Board is investigating these charges.   I call your attention to the letter of May 30, 1975, which was mailed to you.

In fact, I don't think it was mailed to you.   I believe I served it on you personally.

A   Yes, it was.

Q   At that point, didn't you think that was a serious enough nature to start making an effort to pay this money back?

A·  Yes.

Q   Why didn't you?

A   If I had a really good answer to that, Mr. Lieberman, I don't think I would be here today. .I have not addressed this matter in the way in which I should have and I do not have— other than the fact that I do not have the money, I have not taken steps to repay it.

Q   Have you attempted to take out a personal loan to pay that money back?

A   No, I have not.

Q   There was a hearing here about a week and a half ago, roughly.   A week ago Friday, I guess it was.   Have you taken any steps since you have been brought before this Hearing Committee, to secure money to pay back to Mr. Poffit [sic]?

A   No, I have not, and if I may finish that, I think a step to —I may be wrong, but I felt in my mind that taking steps immediately after that hearing and before this hearing would not be considered—would look like some kind of a way to get out from under the braverment [sic] of the offense, and therefore, I did not.

Maybe I should have, but I did not.

Q   Do you intend to pay Mr. Poffit [sic] his money?

A   I would like very much to pay. ·

Q   My question was, do you intend to, not whether you would like to.   Yes or no, do you intend to pay him his money?

A   Well, it is very difficult to say that you intend to pay somebody some money, if one does not have the immediate means to do so.

Petitioner Leopold does not dispute the factual determination of the Disciplinary Board as related above.[9] Instead, he advances the argument that the disciplinary action recommended by the Board (*i. e.* disbarment) is too harsh and, that in reaching its determination the

I would like very much to pay Mr. Poffit [sic] his money.

Q  If I read the newspapers correctly, at least up until September 30, wasn't your salary somewhere in the neighborhood of $27,000?

A  That is correct.

Q  Are you still making a salary in around that area today?

A  Near that, yes.

Q  With a salary of $27,000, you don't know whether or not you can find the means to pay back the money you owe Mr. Poffit [sic]?

A  I don't understand the basis of the question.

Q  I am trying to find out what intentions you have of paying Mr. Poffit [sic] back the money that you owe him, and you are talking around it, Mr. Leopold.  You say, talking about your means and your intentions of what you would like to do.  I would like to have on the record, a statement from you, yes or no, I do or do not intend to pay Mr. Poffit [sic] back his $6,000 or whatever the amount is.

A  I intend to pay Mr. Poffit [sic] back.  Of course, if I don't have a livelihood, I can't very well pay him back.

I certainly do intend to pay him back.

Q  How much of the money do you intend to pay him back?

What amount?

A  The best of my recollection, Mr. Poffit [sic] gave me $5,500 for safe keeping.  That is what I intend to pay him back.

Q  Do you intend to pay him the interest that is included in the Court Order that was introduced into evidence at the last hearing?

A  Well, if the Board please, I believe that the kind of payment that should be made between me and Mr. Poffit [sic] is a matter for Mr. Poffit [sic] and me, or Mr. Poffit's [sic] attorney and me.

I had not thought that the Board was going to be used as a collection agency.  I have said that I intend to pay the money back, with or without interest, the precise amount, I believe, is something for me and Mr. Poffit [sic] and his attorney to work out.

Transcript of Proceedings Before Hearing Committee 3.01, Disciplinary Board Docket No. 47 DB 75, October 6, 1975, pp. 8–12 (filed October 23, 1975).

9.  *See* excerpts of Mr. Leopold's testimony before the Hearing Board, *supra* note 8.

Board failed to extend sufficient consideration to his conduct between the years 1967 to 1976.

Prior to discussing the merits of this argument, we deem it appropriate to set forth the standards by which we must be guided in matters involving disciplinary measures initiated against members of the bar.

■ The public position of one who is a member of the legal profession is one of great responsibility. Integrity and the exercise of good faith in an attorney's professional engagements are essential for the protection of the public, the courts and the profession itself. It must be fully appreciated that each member of the bar is an officer of the Court. Consequently, it is the solemn duty of the judiciary to insure that the proper standing of its officers is preserved.[10] *See Johnson Disbarment Case,* 421 Pa. 342, 345, 219 A.2d 593, 595 (1966); *In re Davies,* 93 Pa. 116, 122 (1880).

Justice Mercur, writing for this Court in *In re Davies, supra,* at 121, affirmed a lower court's disbarment order noting that:

"This [disbarment] is a power inherent in every court when a person is shown to be unfit to practice in it. . . . Such an order is a judicial act to be done in

**10.** "In *In Re Echeles,* 430 F.2d 347, 349–50 (7th Cir. 1970), the court presented a lucid explanation of the purpose of a disciplinary action: '[D]isbarment and suspension proceedings are neither civil nor criminal in nature but are special proceedings, sui generis, and result from the inherent power of courts over their officers. Such proceedings are not law suits between parties litigant but rather are in the nature of an inquest or inquiry as to the conduct of the respondent. They are not for the purpose of punishment, but rather seek to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice. Thus the real question in issue in a disbarment proceeding is the public interest and an attorney's right to continue to practice the profession imbued with the public trust." *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 478, 345 A.2d 616, 619–20 (1975).
*See generally* Comment, *The Objectives of Attorney Discipline: A Pennsylvania View,* 79 Dick.L.Rev. 558 (1975).

the exercise of judicial discretion. It must, therefore, be governed by a sound judicial discretion guarding and protecting the just rights and independence of the bar, the dignity and authority of the court, and the safety and protection of the public: *Ex parte Secombe,* 19 Howard 9, 15 L.Ed. 565."

In the case of *Maryland State Bar Association, Inc. v. Agnew,* 271 Md. 543, 318 A.2d 811 (1974), Judge Digges, speaking for the Court of Appeals in affirming the disbarment of former Vice-President Spiro T. Agnew, succinctly stated the principles applicable here:

"Few vocations offer as great a spectrum for good and honorable works as does the legal profession. The attorney is entrusted with the life savings and investments of his clients. He becomes the guardian of the mentally deficient, and potential savior for the accused. He is a fiduciary, a confidant, an advisor, and an advocate. However, the great privilege of serving in all of these capacities does not come without the concomitant responsibilities of truth, candor and honesty. In fact, it can be said that the presence of these virtues in members of the bar comprises a large portion of the fulcrum upon which the scales of justice rest. Consequently, an attorney's character must remain beyond reproach.

*A court has the duty, since attorneys are its officers, to insist upon the maintenance of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute.* Disciplinary procedures have been established for this purpose, not for punishment, but rather as a catharsis for the profession and a prophylactic for the public." (Emphasis added).

This Court has long recognized the grave nature of disciplinary procedures and our responsibility to exercise our inherent power to impose the extreme sanction of

394

disbarment with caution. *E. g., In re Shigon,* 462 Pa. 1, 329 A.2d 235 (1974) ; *In re Berlant,* 458 Pa. 439, 328 A. 2d 471 (1974) ; *Johnson Disbarment Case,* 421 Pa. 342, 219 A.2d 593 (1966) ; *In re Graffius,* 241 Pa. 222, 88 A. 429 (1913). In our decision of *In re Graffius, supra,* at 223–24, 88 A. at 430, we explained the balance which must be accomplished in fulfilling this task:

> "The power of a court to disbar an attorney should be exercised with great caution, but there should be no hesitation in exercising it when it clearly appears that it is demanded for the protection of the public. The court by admitting an attorney to practice endorses him to the public as worthy of confidence in his professional relations, and if he becomes unworthy, it is its duty to withdraw its endorsement: *Davies' Case,* 93 Pa. 116." [11]

Attorneys, by the very nature of their position within the legal framework, have been granted the *privilege* of exercising certain professional powers not possessed by members of the public at large. *In re Davies,* 93 Pa. 116 (1880). As overseers of the profession, the Court must remain alert to potential abuse of this professional power by members of the bar.[12]  Therefore,

---

11.  The standard of proof necessary for sustaining a recommendation for disbarment was set forth in our opinion in *In re Berlant,* 458 Pa. 439, 328 A.2d 471, 473 (1974):

> "While we recognize the severe impact that such sanctions may have on an individual's career, we are also mindful of our duty to uphold the quality and integrity of the Bar.  Accordingly, we shall not require proof beyond a reasonable doubt, but shall retain the standard which this Court has consistently utilized in disciplinary cases through the years: 'that a preponderance of evidence is necessary to establish an attorney's unprofessional conduct and the proof of such conduct must be *clear and satisfactory.*'"

*See also In re Shigon,* 462 Pa. 1, 18, 329 A.2d 235 (1974).

12.  We are obligated to acknowledge that one of the purposes for attorney disciplinary procedures is to maintain the public confidence in the legal profession and our judicial system.  We believe that adherence to a lenient disciplinary process, in light of the oath each attorney takes as an officer of the Court and the high

when we approach any disciplinary proceeding, we do so well-apprised of the potentially grave repercussions our decision may carry and the obligations with which we are charged.

Petitioner here contends that the Disciplinary Board failed to allot adequate consideration to his reformation which occurred subsequent to the incident giving rise to these disbarment proceedings. We cannot agree. Petitioner was extended numerous opportunities to present to both the Board and this Court every scrap of relevant evidence he desired. Although he failed to take advantage of the numerous opportunities made available, he did, in fact, apprise the Hearing Board of some of his laudable achievements since 1967.[13] This information was made a part of the record which the Hearing Board had at its disposal. We must presume, therefore, in the absence of any demonstration to the contrary, that the Board considered petitioner's subsequent behavior in arriving at its recommendation of disbarment.

Yet, even assuming arguendo that the Board neglected to attribute due consideration to the disputed evidence of reformation, it would be unnecessary to remand to the Board for further deliberation. The power to investigate the conduct of an attorney and to impose disciplinary sanctions for violation of his oath, rests with few exceptions, singularly with this Court and its official disciplinary organization.[14] *Office of Disciplinary Counsel v. Walker*, 469 Pa. 432, 366 A.2d 563 (filed July 6,

---

ethical standards the profession subscribes to, would be contrary to the acknowledged goals of protecting the public, the professional and the Court from those individuals not fit to be members of the bar. *See Moyerman's Case*, 312 Pa. 555, 167 A. 579 (1933).

**13.** Transcript of Proceedings Before Hearing Committee 3.01, Disciplinary Board Docket No. 47 DB 75, October 6, 1975, pp. 4, 5, 7, 8 (filed October 23, 1975).

**14.** Pa.Sup.Ct.R. 17–1, 17–5. *See* Pa.Sup.Ct.R. 17–1 for the few exceptions to this Court's exclusive jurisdiction in attorney disciplinary matters.

1976). It is this Court, however, which dispenses the disciplinary sanctions of public censure, suspension or disbarment. The Board is merely an extension of this Court which, when concerned with actions for public censure, suspension or disbarment, *advises* this Court as to its *recommendations*. The recommendation submitted by the Board is not binding on this Court, although it is persuasive. *See Office of Disciplinary Counsel v. Walker, supra.*

In the present matter, we are not convinced that in light of petitioner's public service since 1967 disbarment is too grave a sanction to impose under the circumstances. Rather, having thoroughly reviewed the record, and in light of the revelations contained in petitioner's brief, we are assured that disbarment is the only adequate recourse. Supportive of our position is the observation of the Special Committee on Disciplinary Enforcement that an "attorney who has gone beyond temptation and has converted funds obviously poses a threat to any future client and the public." [15]

It should be emphasized that petitioner's argument, that seven years have passed since the breach of trust occurred which is the substance of this disbarment proceeding, is misleading. Mr. Pofit entrusted Mr. Leopold, not only with his money, but also with the discharge of his legal predicament. This fiduciary relationship between Mr. Leopold and his client did not terminate in 1967. Mr. Leopold had a continuing obligation to advance and not jeopardize the interest of his client. The obligation to deliver to Mr. Pofit upon request the money he held in escrow was no less in 1974, when in fact the demand was initially made, than it would have been in 1967 if Mr. Pofit would have requested the return of the

[15]. Special Committee on Disciplinary Enforcement, *Problems and Recommendations in Disciplinary Enforcement,* 95 ABA Rep. 783, 948 (1970). *See also* Comment, *The Objectives of Attorney Discipline: A Pennsylvania View,* 79 Dick.L.Rev. 558, 575–87 (1975).

money at that time. The breach of trust which occurred under these circumstances was a continuing one, and was not consummated upon the initial unauthorized appropriation of the escrow funds.

In the case of *In re Davies, supra,* this Court was confronted with an analogous situation in which the attorney concerned had misappropriated a bond belonging to his client, but argued that disbarment was not appropriate since he had procured a settlement of the dispute with his client. The words of Justice Mercur, speaking for the Court in disposing of that argument, are persuasive here:

> "It is contended on the part of the plaintiff in error that this settlement operated as an absolution and remission of his offense. This view of the case ignores the fact that the exercise of the power [to disbar] is not for the purpose of enforcing civil remedies between parties, but to protect the court and the public against an attorney guilty of unworthy practices in his profession. He had acted in clear disregard of his duty as an attorney at the bar, and without "good fidelity" to his client. The public had rights which Mrs. Curtiss could not thus settle or destroy. The unworthy act had been fully consummated."

We, therefore, find no merit in petitioner's proposition that the events of his career since 1967 should have a mitigatory effect upon the recommended disciplinary sanction. *See, e. g., Moyerman's Case,* 312 Pa. 555, 167 A. 579 (1933) ; *In re Davies,* 93 Pa. 116 (1880).

Additionally, petitioner in his brief submits the incredible argument that the Board neglected to consider: "that Mr. Pofit never expected to have any funds returned to him"; "that Mr. Pofit is in no worse condition now than he would have been in had he simply given the money to his former employer"; and "that Mr. Pofit waited nearly seven years to inquire as to what happened." The rationale advanced by petitioner itself indi-

cates a lack of the necessary ethical perception demanded of members of the legal profession and an absence of a sense of fairness incumbent upon any individual whatever occupation he or she may choose to follow. Such an irresponsible conception of duty is incompatible with the high standards demanded of the profession by the Code of Professional Responsibility.

Mr. Pofit did not transfer the $5,500.00 to petitioner to be used by the petitioner to advance his personal interests. The fact is that Pofit entrusted the money to Mr. Leopold, as his attorney, for the purpose of settling the potential claims of P. J. Hydraulics, Inc., and for that purpose alone. Any other employment of those funds was violative of the fiduciary relationship established between petitioner and his client. Clearly, Mr. Pofit had a legal right to the return of the money which had not been used in the settlement of any claims made by P. J. Hydraulics, Inc. It follows that petitioner had no legal claim to the possession or use of the funds beyond the terms agreed to with his client. Here, we find it appropriate to emphasize that this petitioner's failure to make any recognizable effort to restore the misappropriated funds to his former client smacks of an irremissible indifference to his ethical obligations. We conclude that the flagrant nature of this petitioner's violation of the trust and confidence placed in him by his client merits disbarment. The recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania, that Marx S. Leopold be disbarred from the practice of law is approved.

## ORDER

AND NOW, this 24 day of November 1976, it is ORDERED, as follows:

1. That Marx S. Leopold is disbarred from the practice of law.

2. That Marx S. Leopold shall comply with the provisions of Rule 17–17 of the Rules of Disciplinary Enforce-

ment of the Supreme Court of Pennsylvania pertaining to disbarred attorneys.