426 A.2d 1138

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**Suber W. LEWIS, Respondent.**

Supreme Court of Pennsylvania.

Argued Jan. 19, 1981.

Decided March 13, 1981.

John W. Herron, Philadelphia, for petitioner.

Abraham J. Brem, Philadelphia, for respondent.

## OPINION OF THE COURT

FLAHERTY, Justice.

On July 18, 1979, the Office of the Disciplinary Counsel charged Suber W. Lewis (respondent) with serious acts of misconduct involving the commingling and conversion of client funds, misrepresentation, and the neglect and intentional failure properly to represent his client. After hearing, the hearing committee found that respondent had vio-

lated DR 1–102(A)(3)(4)(6); 6–101(A)(3); 7–101(A)(3); 9–102(A) and 9–102(B)(3)(4)[1] and recommended a private reprimand to the Disciplinary Board. The Office of Disciplinary Counsel filed exceptions to the recommendation of the hearing committee asserting that a private reprimand was too lenient and reflected neither the gravity of Respondent's misconduct, his past history of prior informal admonitions, nor Respondent's failure (at that time) to make restitution.

1. The disciplinary violations charged are:
DR–1–102. **Misconduct.**
(A) A lawyer shall not:

(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
DR–6–101. **Failing to Act Competently.**
(A) A lawyer shall not:

(3) Neglect a legal matter entrusted to him.
DR–7–101. **Representing a Client Zealously.**
(A) A lawyer shall not intentionally:

(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B).
DR–9–102. **Preserving Identity of Funds and Property of a Client.**
(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
(B) A lawyer shall:

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

On May 30, 1980, a three member panel of the Disciplinary Board heard oral argument and on August 26, 1980 the Board filed its Report and Recommendations to this Court recommending that respondent be suspended for two months. On September 22, 1980 we rejected that recommendation and entered an Order suspending respondent forthwith and issued a Rule that respondent show cause why he should not be disbarred. After a careful review of the entire record in this case, we disbar respondent from the practice of law in the courts of this Commonwealth.

The facts in this case are as follows. Respondent represented Ms. Vernell London in regard to personal injuries she suffered in an automobile accident. The case was to be handled on a contingent fee basis wherein respondent would receive 50% of the balance after medical expenses, expenses of suit, investigation, and witness fees were paid. However, there was no agreement between respondent and Ms. London as to the fee to be charged for processing her no-fault claim. Respondent collected the sum of $3,954.66 from Ms. London's insurance carrier in payment of no-fault benefits under her policy. Approximately $850.00 of this amount represented payment for medical fees. Respondent then caused Ms. London to endorse and return the insurance check to him, asserting that he would pay the outstanding medical bills and return to Ms. London the balance.

On December 21, 1977, respondent deposited the insurance check in his personal account and put the money to his personal use. In January and February of 1978, Ms. London made several oral requests for return of her money. In telephone conversations, respondent repeatedly promised payment and claimed that his failure to pay had been an oversight. On July 7, 1978, approximately six months after depositing the insurance check, respondent finally paid Ms. London one-half of the proceeds, improperly retained the

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

other half as legal fees,[2] and misrepresented that he had paid the incurred medical bills. Respondent did not tell his client in advance that he intended to retain half of the insurance no-fault payment as legal fees and she never consented to his doing so.[3] On July 14, 1978 Ms. London

2. *See* 40 Pa.C.S.A. § 1009.107 and 40 Pa.C.S.A. § 1009.602 (Supp. 1980–1981).

§ **1009.107 Attorney's fees and costs**

Fees of claimant's attorney.

(1) If any overdue no-fault benefits are paid by the obligor after receipt by the obligor of notice of representation of a claimant in connection with a claim or action for the payment of no-fault benefits, a reasonable attorney's fee (based on actual time expended) shall be paid by the obligor to such attorney. No part of the attorney's fee for representing the claimant in connection with such claim or action for no-fault benefits shall be charged or deducted from benefits otherwise due to such claimant and no part of such benefits may be applied to such fee.

(2) If, in any action by a claimant to recover no-fault benefits from an obligor, the court determines that the claim or any significant part thereof is fraudulent or so excessive as to have no reasonable foundation, the court may award the obligor's attorney a reasonable fee based upon actual time expended. The court, in such case, may direct that the fee shall be paid by the claimant or that the fee may be treated in whole or in part as an offset against any benefits due or to become due to the claimant.

(3) If, in any action by a claimant to recover no-fault benefits from an obligor, the court determines that the obligor has denied the claim or any significant part thereof without reasonable foundation, the court may award the claimant's attorney a reasonable fee based upon actual time expended.

Act of July 19, 1974, P.L. 489, No. 176 Art. I Sec. 107.

§ **1009.602 Excessive charges**

Any person who charges, demands, receives or collects for hospital or medical products, services or accommodations rendered in the treatment of an injured person or for rehabilitative occupational training or for legal services rendered in connection with a claim for basic loss benefits, any amount in excess of that authorized by this act with awareness that the charge is in excess of that authorized is guilty of a misdemeanor and upon conviction may be fined not less than one hundred dollars ($100) or more than five hundred dollars ($500) or may be imprisoned for not more than six months or both. Act of July 19, 1974, P.L. 489 No. 176 Art. VI Sec. 602.

3. The respondent in his testimony during the November 27, 1979 hearing stated that Ms. London suggested that he take one-half of the balance of the no-fault insurance proceeds. This contradicted respondent's earlier written statement in his December 13, 1978 letter to the Disciplinary Board that he, not Ms. London, initiated the plan to divide the balance equally.

sent respondent a letter demanding an accounting of the funds remaining in his possession and requesting copies of all papers in her case. Respondent did not respond to this letter although he received it.

It was not until respondent received numerous requests from the doctors, Ms. London, and two attorneys, one representing a doctor and a new attorney representing Ms. London, that, in the summer and fall of 1979, he paid all of the medical bills. As to the other half of the no-fault insurance proceeds in his possession, he did not make restitution of these funds to Ms. London, until May 30, 1980.

On August 30, 1978 and November 15, 1978, respondent received two informal admonitions in matters unrelated to this case for neglect and failure to effect distribution of the assets of two estates.[4] These admonitions occurred at the

4. The August 30, 1978 admonition concerned respondent's handling of the Estate of Victoria Williams, who died testate on December 24, 1974. Respondent filed an inventory in connection with this estate on or about May 12, 1976, and on or about January 14, 1977 paid inheritance taxes and interest assessed against the estate in the amount of $271.45. Between January of 1977 and March 27, 1978, the date the Disciplinary Board's file was opened, respondent took no further action to complete the estate, even though he had received a written request in January of 1978 to make distribution.

The November 15, 1978 admonition concerned respondent's actions as attorney for the Estate of Hanna J. Cooper, who died testate on September 6, 1973. An initial complaint about respondent's handling of this estate was sent to him by the Disciplinary Board on November 4, 1976. Later that month respondent advised the Disciplinary Board that he was preparing the first and final account for this estate and would file it in time for the next Orphans' Court audit. Accordingly, in January, 1977 the complaint against respondent concerning the administration of this estate was dismissed based on respondent's representations that the matter would be concluded shortly. In spite of these representations, the first and final account was not filed until September 12, 1977. Although the Office of Disciplinary Counsel requested information as to the status of the estate by letters dated January 13, 1977, July 7, 1977 and September 15, 1977, no response to these letters was received until September 22, 1977, when respondent advised that he would make final distribution and close the estate when the court filed its adjudication. The court filed its adjudication on April 6, 1978. Respondent represented that he would make final distribution within a few days of the filing of the adjudication in a letter to the complainant's attorney dated April 12, 1977. However, as of July 31, 1978, the date of the opening

time when respondent was wrongfully withholding repayment of Ms. London's funds and involved the same offense: frustrating the distribution of monies due and owing to clients.

Respondent offers no explanation for his withholding of Ms. London's money and late payment of her bills except that for a time he was disorganized by involvement in two businesses and a business relocation, that he did not know he was forbidden by statute to apply any part of no-fault payments received by his client to a fee for making a claim for no-fault benefits, and that Ms. London consented to his retention of half of the money in her account as anticipated payment of his fee in the liability claim.

The hearing committee found that respondent had violated Disciplinary Rules 1–102(A)(3) illegal conduct involving moral turpitude; Rule 1–102(A)(4) engaging in conduct involving dishonesty, fraud, deceit or misrepresentation; Rule 1–102(A)(6) conduct that adversely reflects on ability to practice law; Rule 6–101(A)(3) neglect of a legal matter entrusted to him; Rule 7–101(A)(3) prejudicial treatment of client; Rule 9–102(A) not preserving identity of funds and property of a client; Rule 9–102(B)(3) not maintaining complete records and not rendering appropriate accounting to his client; Rule 9–102(B)(4) not promptly paying to the client, as requested, funds in the possession of the lawyer which his client is entitled to receive.

■ Although our review in attorney disciplinary cases is *de novo*, and although we are not bound by the findings of either the hearing committee or the Disciplinary Board, except as guidelines for judging the credibility of witnesses, *Matter of Green*, 470 Pa. 164, 167, 368 A.2d 245 (1977), we can find no reason in this case to disturb the findings of the hearing committee. The question, rather, is the appropriate disciplinary action to be taken as a result of such infractions of the Disciplinary Rules as have been found.

of the Disciplinary Board's file, he had not made final distribution in the estate.

To begin with, we observe that respondent's exculpatory arguments are not helpful to his case. As to his professed ignorance of pertinent provisions of the no-fault statute, an area in which respondent practiced, it goes without saying that a lawyer will be held to a knowledge of the law in the areas of his practice. Concerning respondent's business or personal difficulties, we have stated:

> The office of an attorney does not permit the attorney's personal pecuniary embarrassments to be solved by unauthorized use of fiduciary funds. Retention of a client's money after demand therefore is ground for disbarment.

*Griffith's Case*, 321 Pa. 64, 65, 184 A. 76 (1936). Finally, we find unbelievable respondent's assertion that Ms. London consented to his retention of half of the proceeds of the insurance no-fault payment. Respondent's credibility is not bolstered by his contradictory versions of who originated the plan that he keep half of the insurance proceeds.[5]

Our task in cases such as this is to protect the public and to preserve the public confidence in the legal profession and the judicial system. *Matter of Leopold*, 469 Pa. 384, 394, 366 A.2d 227, 231–232 (1976); *Office of Disciplinary Counsel v. Grigsby*, 493 Pa. 194, 425 A.2d 730 (1981); *Office of Disciplinary Counsel v. Herman*, 493 Pa. 267, 426 A.2d 101 (1981). In accomplishing this task we must balance a concern for public welfare with a respect for the substantial interest that an attorney has in continuing his professional involvement in the practice of law:

> "The power of the court to disbar an attorney should be exercised with great caution, but there should be no hesitation in exercising it when it clearly appears that it is demanded for the protection of the public. The court by admitting an attorney to practice endorses him to the public as worthy of confidence in his professional relations, and if he becomes unworthy, it is its duty to withdraw its endorsement: *Davies' Case*, 93 Pa. 116."

*Id.* (Footnote omitted). Our concern for the protection of the public arises from the privileged position occupied by

5. See note 3, *supra*.

lawyers in relation to the public within the legal sphere. The nature of this position has been articulated by the Maryland Court of Appeals in the case of *Maryland State Bar Association, Inc. v. Agnew*, 271 Md. 543, 318 A.2d 811 (1974), cited with approval in *Matter of Leopold, supra*, affirming the disbarment of former Vice President Spiro T. Agnew:

> Few vocations offer as great a spectrum for good and honorable works as does the legal profession. The attorney is entrusted with the life savings and investments of his clients. He becomes the guardian of the mentally deficient, and potential savior for the accused. He is a fiduciary, a confidant, an advisor, and an advocate. However, the great privilege of serving in all these capacities does not come without the concomitant responsibilities of trust, candor and honesty. In fact, it can be said that the presence of these virtues in members of the bar comprises a large portion of the fulcrum upon which the scales of justice rest. Consequently, an attorney's character must remain beyond reproach.
>
> *A court has the duty, since attorneys are its officers, to insist upon the maintenance of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute.* Disciplinary procedures have been established for this purpose, not for punishment, but rather as a catharsis for the profession and a prophylactic for the public. (Emphasis added).

469 Pa. 384, 393, 366 A.2d 227, 231 (1976). Although respondent in this case has made belated restitution, he has also committed grave infractions of the Disciplinary Code and has acted with seeming indifference to the efforts of the Disciplinary Board to restore to Ms. London funds which were due and owing. Such actions cannot be said to be consistent with the high ethical standards of the profession, with a lawyer's fiduciary responsibility to his client, with a character that is beyond reproach, or with truth, candor and honesty.

■ What we wish to emphasize in this case is that Mr. Lewis's actions involved a breach of public trust. A client must be able to look to his attorney for sound advice; know that the attorney will pursue the client's interests vigorously and effectively; and rest assured that any financial transactions carried out on the client's behalf will be scrupulously honest, will be fully accounted for at the client's request, and will involve full and immediate payment of funds that are due and owing the client. This public trust that an attorney owes his client is in the nature of a fiduciary relationship involving the highest standards of professional conduct.[6]   As the United States Court of Appeals for the Seventh Circuit put it: "[T]he real question at issue in a disbarment proceeding is the public interest and an attorney's right to continue to practice a profession imbued with public trust." *In re Echeles,* 430 F.2d 347, 349–350 (7th Cir. 1970), cited with approval in *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 479, 345 A.2d 616, 620 (1975), cert. den. 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976).

■ The record in this case compels the disbarment of Mr. Lewis. Respondent not only has breached the public trust with regard to his handling of the matter entrusted to him by Ms. London, but he has been involved also in other similar acts of misconduct in two unrelated cases during the

---

**6.** Black's *Law Dictionary* (4th Ed. 1951) defines "fiduciary" as follows (citations omitted):

**FIDUCIARY.** The term is derived from the Roman law, and means (as a noun) a person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires. A person having duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking. As an adjective it means of the nature of a trust; having the characteristics of a trust; analogous to a trust; relating to or founded upon a trust or confidence.

"Fiduciary Capacity" is defined:

**FIDUCIARY CAPACITY.** One is said to act in a "fiduciary capacity" or to receive money or contract a debt in a "fiduciary capacity," when the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.

same time period. Accordingly, the recommendation of the Disciplinary Board for a two month suspension is rejected and Suber W. Lewis is disbarred from the practice of law within the Commonwealth of Pennsylvania.

NIX, J., did not participate in the consideration or decision of this case.