# In re Anonymous No. 65 D.B. 89

Disciplinary Board Docket no. 65 D.B. 89.

*Hearing Committee,* December 7, 1990—A petition for discipline was filed against respondent for his neglect and failure to adequately represent his client in a legal matter entrusted to him in violation of Disciplinary Rules 2-110(A)(2), 6-101(A)(3), 7-101(A)(1), (2), and (3), and Rule 1.16(d).

Essentially the client in question, [A], consulted with respondent on or about May 8, 1985 to discuss a claim for damages as a result of property damage incurred due to flooding within his home.

The ultimate issue to be determined in this case is whether respondent in fact had been retained to prosecute a claim on behalf of [A] against the City of [B] or such other interested parties to recover for property damage incurred as a result of a flood within his home. A secondary issue involved in this case is whether respondent discharged his legal responsibilities to [A] for any legal representation that he did undertake on behalf of his client.

It is the conclusion of the hearing committee that the evidence was insufficient to demonstrate, by a preponderance of the evidence that was clear and satisfactory, that respondent violated the charged Disciplinary Rules and the committee recommends that the charges against respondent be dismissed.

## STATEMENT OF CASE

The petition filed against respondent charges him with professional misconduct.

Respondent is charged with violating D.R. 2-110(A)(2), which prohibits a lawyer from withdrawing from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client; RPC 1.16(d), which states that upon termination of representation a lawyer shall take steps to the extent reasonably practical to protect a client's interest, such as giving reasonable notice to the client, allowing time for employment of other counsel, and surrendering papers and property to which the client is entitled; D.R. 6-101(A)(3), which prohibits a lawyer from neglecting a legal matter entrusted to him; Disciplinary Rules 7-101(A)(1), (2) and (3), which prohibit a lawyer from intentionally failing to seek the lawful objectives of his client, from intentionally failing to carry out a contract of employment entered into with a client and from intentionally prejudicing or damaging a client during the course of the professional relationship.

In addition to the above charges, respondent is also charged with violating D.R. 2-110(A)(3), which mandates that a lawyer who has withdrawn from employment shall properly refund any part of a fee paid in advance which has not been earned. Respondent contends that the fees received by him had

been earned in full and that a refund is not due and owing to [A]. Petitioner will not pursue these charges against respondent.

A hearing on the merits was held in this matter on March 21, 1990. Respondent appeared at the hearing represented by counsel. Petitioner's case consisted of a stipulation of fact marked exhibit J-1 which was admitted into evidence. In addition to the stipulation of fact, petitioner also presented the testimony of [A]; his wife, [C]; and [D]. Additional exhibits marked and identified as exhibits P-1 through P-8 and PA-2 were admitted into evidence. Respondent testified on his behalf and presented the testimony of [E], [F], Esq., and [G]. In addition, respondent submitted exhibits R-1 through R-12, inclusive, all of which were admitted into evidence.

Present on behalf of the Hearing Committee [   ] on March 28, 1990 were [   ].

## FINDINGS OF FACT

(1) Respondent, [   ], who was admitted to practice law in the Commonwealth of Pennsylvania in 1975, maintains a law office at [   ].

(2) Respondent, at the time of the disciplinary hearing, was 40 years of age, married, and the father of two minor children. (N.T. 120.)

(3) Respondent is a graduate of [H] College (1972) and the [H] School of Law (1975). (N.T. 121-22.)

(4) Since 1975, when respondent began to practice law, he has served as a law clerk to the Honorable [   ] and as a part-time assistant public defender, and has engaged in the practice of law as a sole practitioner. (N.T. 124-27.)

(5) The respondent's practice of law emphasizes trial work with particular emphasis on criminal law and personal injury. (N.T. 126-27.)

(6) Respondent is an active member of many organized bar associations as well as active in the [J] County community. (N.T. 128-32.)

(7) Respondent enjoys an excellent reputation within the legal community and community at large as a law-abiding citizen who is truthful and honest and enjoys an excellent reputation as a practicing attorney as verified by [F], Esq., the former solicitor of [J] County (N.T. 108-09); [G], former District Justice in [J] County and a paralegal for respondent (N.T. 118-19); and [E], the office manager for respondent (N.T. 100-01.)

(8) Respondent first met with [A] on May 8, 1985 when [A] came to him seeking advice about a potential claim against the City of [B] for repair work as a result of water damage to his basement due to flooding. (N.T. 133-34.)

(9) During this initial consultation, respondent completed an initial consultation form (exhibit R-9), which form reflects thereon that [A] advised respondent: (1) that the City of [B] was working the prior week on his street (one block from his house); (2) that the city water department and city would pay for any damage incurred by him; and (3) that [Q] of the city advised [A] to send his bills to the city and they would pay for the damage to his home. (N.T. 135; exh. R-9.)

(10) [A] represented to respondent that the City of [B] might be attempting to do something "fishy" to him since an individual named [I] who worked for the City of [B] advised [A] to "let him in" and that he might be able to assist [A] in getting the work

done on his home if his claim of $4,800 is paid. (N.T. 69-72, 138; exh. R-1, R-9.)

(11) Respondent advised [A] that he would assist [A] for a very limited purpose and attempt to assist [A] in processing his claim. (N.T. 138-39, exh. R-9.)

(12) Respondent's initial consultation form (exhibit R-9) reflects thereon that respondent stated under the category on the form entitled "Advice to Client" as follows:

"(a) Value not justify attorney but will call to facilitate deal already reached.

"(b) Distance, time and intervening rain creates causation problems—expert required (dig up street).

"(c) Tort immunity—standard defense.

"(d) Double check homeowner's insurance."

(13) Respondent's consultation notes on exhibit R-9 further reflect:

"(a) *Client Requested Action:* Make sure they don't 'pull anything with payment,' 'something fishy,' don't have any money to pay attorney. Tell them to pay us. [   ] gets $9 per hour—I get $7 per hour."

"(b) *Attorney To Do: Agreed to call [D]—no more.*"

(14) Respondent was of the opinion and belief at the time of his initial consultation that the city had agreed to pay the $4,800 and that [A] wanted to be assured there would be no "funny business" and that he would legally obtain the money within his claim. (N.T. 138.)

(15) Respondent further advised [A] he would contact the insurance adjuster, [D], to be assured that the claim was satisfactory, but warned [A] that if this matter developed into a dispute it would not justify respondent representing him on a $4,800 claim, especially if later estimates were substantially

lower, which advice respondent believed [A] understood but wanted a "big time attorney" to represent him. (N.T. 139-40.)

(16) Respondent further advised [A] during his initial consultation there would be difficulty establishing legal causation between the city and a leak in his home due to the proximity of the work to his home and that an expert would be necessary if this matter were litigated. (N.T. 140-41.)

(17) Respondent at no time agreed to prosecute a claim in any court of record on behalf of [A] or otherwise pursue this matter other than making telephone calls to facilitate a "supposed" settlement. (N.T. 142.)

(18) Respondent requested and received a check for $75, which represented his consultation fee, on May 8, 1985. (N.T. 142.)

(19) Respondent communicated with a contractor named [R] who was working approximately 300 yards from [A] home and, according to [R], they were not near enough to cause any problems to [A]. (N.T. 144.)

(20) Respondent did communicate with [D], the insurance adjuster, threatening suit in order to obtain the attention of the city and the adjuster to effectuate a settlement in this matter. (N.T. 145-46; exhs. P-2 and P-3.)

(21) Respondent concluded after communicating with [D] that a settlement with the city was not imminent, and further the claim was not even recognized, all of which was contrary to the information provided by [A]. (N.T. 147; exh. P-4.)

(22) Respondent had been led to believe that estimates had been provided to the city or would be provided to the city including an estimate of $4,800, a copy of which had been provided to him by [A]

during their initial consultation, which estimates had not been delivered to [D] at any time. (N.T. 147.)

(23) The only information within the possession of [D], the insurance adjuster, as to the amount and nature of the claim was that [K] Home Remodelers had submitted an estimate of $4,800 to complete the repair work. (N.T. 95.) Significantly, [D] testified that he received no documents to support [A's] claim, specifically R-2, the $4,800 estimate prepared by [K] Home Remodelers. (N.T. 94-95.)

(24) After receiving communication from [D] that there was no agreement to pay [A], respondent immediately communicated by telephone with [A] that he was "miffed" about pursuing the settlement aspects of this claim since there was in fact no agreement and it appeared [A] was contending the persons with whom respondent should be communicating, namely [D], [Q], an employee of the city, and [L] were not telling the truth. (N.T. 149.)

(25) Respondent after receiving correspondence identified as P-4 from [D] reflecting that there was in fact no agreement to pay [A's] claim, called Mr. [P], the city solicitor, to discuss this claim. (N.T. 148-49.)

(26) The telephone call to [A] referred to in paragraph 24 was on or about July 16, 1985 according to the notes of respondent on exhibit R-10.

(27) On December 12, 1985, respondent and [A] met again which meeting is reflected in exhibit R-10. (N.T. 150.) At this meeting of December 12, 1985, which took place without any prearranged appointment, [A] was again advised that the cost of litigation and expert witnesses fee would exceed any recovery. Respondent further reminded [A] that he had not been truthful with him at his first meeting

relative to the facts and circumstances surrounding his claim. (N.T. 151-53; exh. R-10.)

(28) Respondent charged [A] $125 for the time expended for work performed between their initial meeting and December 12, 1985. (N.T. 152-53; exh. R-10.)

(29) Respondent, on December 12, 1985, reiterated that he would not represent [A] in prosecuting his claim and was not in fact handling the said matter in that respect. (N.T. 154.)

(30) Respondent's office manager, [E], conversed with [A] by telephone on December 20, 1985. (N.T. 99; exh. R-8.)

(31) On December 20, 1985, [E] advised [A] that respondent was not representing him and advised [A] to contact the [M] and also recommended that he seek the advice of another attorney who was not as busy as respondent. (N.T. 99-100; exh. R-8.)

(32) Respondent next met with [A] on March 6, 1986 when [A] appeared at his office again without an appointment wherein he again advised [A] that he could not do anything for him and to seek the advice of another attorney in [J] County named [N]. (N.T. 155-56; exh. R-10.)

(33) Respondent acknowledged receiving a letter from [A] dated October 19, 1986 and that he called [A] and again advised him that he could not take this case for economic reasons and that [A] should pick up any photographs in his file. (N.T. 159-61; exh. R-10.)

(34) In his file respondent only had copies of photographs supplied to him by [A]. (N.T. 156-62; exh. R-12.)

(35) Respondent, after receiving notice from the Office of the Disciplinary Counsel of the complaint, spoke by telephone with [A] who advised respon-

dent (according to respondent) that he would withdraw his complaint if respondent would file a small-claims complaint. (N.T. 165-66.)

(36) Respondent emphatically represents that he never advised [A] he would represent him in this matter except in a very limited role, which advice is reflected in contemporaneous notes made by respondent. (N.T. 165; exhs. R-9 and R-10.)

(37) [A] testified that he paid an additional $125 in December 1985 which was "supposed to be for arbitration fees, if I recall right, and a meeting with the parties involved. He (respondent) said it would cost me $125 in advance to set up this meeting, to my knowledge." (N.T. 21.) [A] contends that respondent has all of the pictures of the damage and he "thinks" he provided an associate of respondent with a few bills for money spent out of his own pocket. (N.T. 31.)

(38) [A] admits that respondent never told him he was going to proceed on a breach of contract action and never advised him he was not going to represent him. (N.T. 31.)

(39) Although respondent represented [A's] son some time in 1984 and 1985, he has no recollection of the representation. (N.T. 32-35.)

(40) [A], at the time of the hearing, was 65 years of age (N.T. 34) and had difficulty remembering facts surrounding his son's prior representation since it occurred approximately six years before the hearing and he did not have any notes to aid him. (N.T. 34.)

(41) [A] stated he advised respondent that he had spoken with [D] who questioned him about the bill of $4,800 and that [D] advised that the city would pay for his damages to the basement. (N.T. 35.)

(42) [A] further testified that a person named [Q] "okayed certain damages" and that she worked for

the City of [B]. (N.T. 36.) [A] further testified that some time after their initial meeting, he turned photographs over to an associate of respondent but has no idea the name of that associate or the date thereof. (N.T. 38-45.)

(43) During the course of [A's] testimony, [A] testified from a yellow sheet of paper that he had prepared for purposes of his testimony at the hearing. (N.T. 12-15, 39-41, 44-45.)

(44) On May 8, 1985 when [A] met with respondent, he presented respondent with a note, exhibit R-1, which reflected that an individual named [O] was going to assist him in processing his claim for damages if he could inspect the cellar. (N.T. 45-46.)

(45) [A] testified in 1988 after the complaint was filed against respondent he was going to withdraw his complaint against respondent because he understood that respondent had not represented him and further that respondent had not agreed to represent him. (N.T. 56.)

(46) [A] denies providing respondent on May 8, 1985 with any estimates for damages especially Exhibit R-2 which is an estimate from [K] Home Remodelers dated April 9, 1985 for $4,800. (N.T. 58.)

(47) [A] contends that the estimate of $4,800 from [K] Home Remodelers, a copy of which was in the possession of respondent, was obtained by respondent and that he himself had never received a copy of said estimate. (N.T. 58.)

(48) [A] contends that respondent advised him that he would "take care of it," meaning that he would obtain the estimate of [K] Home Remodelers from the City of [B]. (N.T. 58.)

(49) [A] admits providing estimates marked as exhibits R-3 and R-4, which were either given to

respondent personally or through one of his associates. (N.T. 59.).

(50) [A] testified that exhibit R-2, the estimate from [K] Home Remodelers, was never seen by him prior to the hearing before the Disciplinary Hearing Examiners. (N.T. 59.)

(51) [A] denies ever providing an estimate of $4,800 to the City of [B]. (N.T. 59.)

(52) [A] does not recall whether respondent advised him that [D] stated that [A] had lied to respondent when he stated the city had agreed to pay [A's] damages. (N.T. 63.)

(53) [A] admitted that he represented to respondent that [Q], of the City of [B], had indicated that she approved [A] to do work on his house to repair the damage. (N.T. 64.)

(54) [A] was aware that [D] had advised respondent that [A] was telling an "outright lie" relative to any approval by a representative of the city for work to be done on his home. (N.T. 64.)

(55) [A] allowed a representative of [K] Home Remodelers to inspect his home for purposes of providing an estimate although he had not made such a request. (N.T. 70-71.)

(56) Although prior to the hearing [A] never saw R-2, the estimate prepared by [K] Home Remodelers, he acknowledged that the estimate accurately described the type of damage to his basement; and further, the date that appears on the estimate is April 9, 1985. (N.T. 73.)

(57) Notes provided to respondent on May 5, 1985 in the handwriting of [A] reflect that Mr. [D] called [A] at work and inquired as to whether [A] had "okayed a job for $4,800." (See exh. R-5.)

(58) The note reflected in R-5 also reflects thereon that [A] advised [P] to contact [Q] of the city to get approval. (See exh. R-5.)

(59) [A's] testimony reflects that it is possible that his home was inspected by [K] *after* he had contacted respondent. (N.T. 73-74.)

(60) The estimate that [A] had never seen prior to the hearing was signed by [P]. (N.T. 75.)

(61) [P] left his card with [A] who in turn gave it to respondent on May 8, 1988. (N.T. 75-76; exh. R-6.)

(62) [A] admitted meeting with [P] when he did the estimate. (N.T. 75-76.)

(63) The notes of [A] contained on R-5 also reflect that he did speak with Mr. [D] as well as [Q]. (N.T. 75-76.)

(64) Mr. [D] had no record of [A] calling him (N.T. 92); however, Mr. [D] called [A].

(65) The estimates which were marked as exhibits R-2, R-3 and R-4 were never submitted to [D]. (N.T. 95.)

(66) [D] is unaware of the source of his information, but a reference to the estimate of $4,800 from [K] Home Remodelers was contained within his files. (N.T. 95.)

(67) According to [D], his file reflects that a claim for $4,800, dated May 8, 1985, was made for loss to [A's] property. (N.T. 96.)

(68) [A] was aware that respondent was charging $75 per hour and received no billings after the initial consultation and subsequent meeting in December 1985. (N.T. 46-49.)

(69) Respondent never filed a civil complaint or commenced a civil action on behalf of [A] against the City of [B] or against [R] Plumbing in the [J] County Court of Common Pleas, or has ever written

a letter of representation to [R] Plumbing concerning [A's] case. (Stip. of fact, paras. 1, 2 and 3.)

(70) Respondent provided the City of [B] with notice of a potential claim within six months of the loss sustained by [A]. The City of [B] through [F], city solicitor at the time, was placed on notice within six months as required by statute. (N.T. 106-08.)

(71) With the exception of photocopies of photographs, there is insufficient evidence presented to demonstrate that [A] unquestionably left other material for respondent to review. (N.T. 31.)

## DISCUSSION

Respondent's testimony demonstrates that he met with [A] on May 8, 1985 and made it very clear to him that his representation would be very limited. Respondent took an initial consultation fee of $75 and had the understanding from [A] that the City of [B] had already agreed to pay and [A] only wanted the respondent to oversee the matter because of the unusual conduct that [A] characterized about Mr. [I]. Respondent's notes reflect this limited involvement on behalf of [A].

Respondent indicated he attempted to call Mr. [D] and then responded to a letter from Mr. [D]. He indicated when he received Mr. [D's] letter of July 15, 1985 (exhibit P-4), he realized that Mr. [A] had not been candid with him because the city clearly was not accepting any responsibility and was not going to pay this claim. Respondent then spoke to Mr. [F], the city solicitor, who advised that the city would not honor this claim. It should be noted that Mr. [F] indicated that the aforementioned conversation with respondent and the respondent's letter to

Mr. [D], clearly put the city on notice so as to satisfy the six-month notice requirement.

Respondent's version of the factual background of this matter is supported by the testimony of Mr. [F], the correspondence to [D] and his response thereto (exhs. P-3 and P-4) and the respondent's contemporaneous notes (R-9 and 10.)

Respondent further indicated he again met with [F] on December 12, 1985 and repeated he would not take the case and suggested [A] should seek another counsel. He was paid an additional $125 for that time expended on behalf of [A]. Respondent's contemporaneous notes reflect that he clearly told [A] he would not continue with the case. (Exh. R-10.)

Respondent's version is further supported by the testimony of his office manager, [E]. Ms. [E] has known the respondent for years and also has known [A]. She had a recollection of speaking with [A] on December 20, 1985 and has a contemporaneously made telephone note of that conversation. (Exh. R-8.) She told [A] when he called that respondent had told him previously he would not represent him and she suggested he go to younger attorney or seek some advice from the [M].

Respondent indicated he then spoke to [A] again when he came to his office without an appointment in March 1986. Again, respondent advised [A] he was not representing him. Respondent denied that [A] had ever provided him with documents or met with his associates. [A] had said he met with respondent's associate on two occasions and had given film to said associates, but could not specify the date or time of any meeting or describe the associate. [A's] recollection of events was hazy and, in fact, he could not recall if respondent had represented his son. [A] had prepared his own notes to aid his

testimony before the hearing committee. Notwithstanding the fact that he prepared his own notes, his recollection of events was poor.

Respondent clearly testified he never had any of [A's] photographs in his file, rather he had four xeroxed copies of photographs which were introduced as exhibit R-12. Respondent's contemporaneous notes supported his testimony that he never indicated he would file suit or take any action other than the initial calls and, in fact, he met with [A] on at least two other occasions and clearly explained to him he was not taking the case. Respondent explained the representation language in his letter to [D] was designed to attract the attention of the city quickly in order to resolve the matter at that time.

Respondent's testimony was further bolstered by his character and reputation. Respondent presented three reputable individuals who clearly testified that respondent's reputation in the community for truthfulness, honesty and integrity is excellent; and, further, respondent has a reputation in the community as an excellent practicing attorney. All these factors bolster the respondent's testimony which was corroborated by his contemporaneous office notes.

The weight to be given to the testimony of [A] is a serious issue in this case. He was confronted during cross-examination by exhibit R-2 which was the [K] Home Remodelers estimate, which was actually dated *before* the date any damage was sustained by him. [A] denied not only presenting this estimate to respondent, but further stated he had never seen this estimate before the day of the hearing. He contends respondent obtained this estimate from the City of [B]. [A's] testimony reflects a great deal of confusion when being questioned about

the persons to whom he had spoken from the City of [B] prior to seeing respondent and the date his home was inspected for purpose of preparing the estimate by [K] Home Remodelers. It is clear from the notes of [A] as well as respondent that a representative of [K] Home Remodelers had met with [A] prior to his meeting with respondent. Yet, [A] would like the hearing committee to believe that he had nothing to do with [K] Home Remodeler's estimate and that respondent himself was responsible for obtaining the estimate. The testimony of [A] as to this estimate is not believable. Additionally, his memory is not clear as to whom he supplied photographs at respondent's office, yet he is sure he provided not copies of the photographs but the photographs themselves to respondent. Again, the testimony of [A] is not believable as to the material left with respondent for his review.

[A] also indicated during his testimony that he was aware that respondent had no longer been representing him and was willing to withdraw the complaint against respondent. The hearing committee is not convinced that [A] truly believed or in fact engaged respondent to *undertake litigation* on his behalf at the rate of $75 per hour.

The hearing committee after having had an opportunity to examine the demeanor and ability of [A] to answer questions concludes that [A] did not wish to engage in protracted litigation to process his claim but was rather looking to utilize an attorney of respondent's stature to effectuate a "quick solution to his problem." A further reflection of [A's] credibility and the weight to be given to his testimony is the investigation conducted by respondent of the claim after his initial consultation with [A]. The contemporaneous notes of respondent not only buttress his testimony, but also portray the facts as

related to him by [A] in May 1985 as inaccurate. It is significant to note that, for whatever reason, [A] chose not to seek the advice of other counsel.

In conclusion, petitioner has failed to sustain its burden of proof. There is not a preponderance of the evidence which is clear and satisfactory to demonstrate that respondent's conduct violated the Disciplinary Rules as alleged. To the contrary, respondent's testimony, the testimony of his office manager, the testimony of Mr. [F], the city solicitor, the testimony of Mr. [D] and the contemporaneous notes made by respondent (R-8, R-9 and R-10) cast doubt on the allegations, credibility and memory of [A].

In assessing whether the evidence is sufficient to support a finding of violation of the Code of Professional Conduct by respondent, the petitioner, Office of Disciplinary Counsel, has a more stringent burden of proof than in a civil matter though a lesser standard than a criminal case. The standard of proof in a disciplinary case is set forth in *Matter of Leopold,* 469 Pa. 384, 366 A.2d 227 (1976). The Supreme Court in *Leopold* reiterated its standard as set forth *In re Berlant,* 458 Pa. 439, 328 A.2d 471 (1974), as follows:

"[T]hat a preponderance of the evidence is necessary to establish an attorney's unprofessional conduct and the burden of such conduct must be *clear and satisfactory.*" *Matter of Leopold, supra,* at n.1.

## CONCLUSIONS OF LAW

(1) Petitioner has failed to sustain its burden of proof by clear and satisfactory evidence, that respondent undertook to represent his client in such a fashion that he was considered to have withdrawn from his employment thereof without having taken

reasonable steps to avoid foreseeable prejudice to the rights of his client, intentionally prejudiced or damaged his client during the course of his professional relationship, and failed to take the necessary steps reasonably practical to protect his client's interest upon termination of representation, thereby not proving a violation of Disciplinary Rules 2-110(A)(2) and 7-101(A)(3) and RPC 1.16(d).

(2) [A] has failed to sustain his burden of proof by clear and satisfactory evidence, that respondent had undertaken representation of his client with regard to his claim for property damage, thereby failing to prove there was an obligation upon respondent to prosecute his client's property-damage claim and therefore respondent did not neglect any legal matters entrusted to him, did not intentionally fail to seek his client's lawful objectives through reasonably available means permitted by law, and did not intentionally fail to carry out a contract of employment entered into with his client for professional services, thereby not proving a violation of Disciplinary Rules 6-101(A)(3) and 7-101(A)(1).

(3) There is no violation of Disciplinary Rule 2-110(A)(3) by respondent in that the petitioner has failed to present any evidence or otherwise advance argument that respondent violated said Disciplinary Rule.

## RECOMMENDED DISPOSITION OF THE PETITION

For the reasons set forth within this report, including the findings of fact, discussion and conclusions of law, this hearing committee recommends that the charges filed against respondent be dismissed.

## ORDER

And now, February 5, 1991, upon consideration of the report and recommendation of Hearing Committee [   ] filed December 7, 1990, it is hereby ordered that the charges against [respondent] docketed at no. 65 D.B. 89 be dismissed.