## In re Anonymous No. 44 D.B. 87

Disciplinary Board Docket no. 44 D.B. 1987.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

TUMOLO, *Member,* November 23, 1988—Pursuant to rule 208(d), Pa.R.D.E., the disciplinary board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

## HISTORY OF PROCEEDINGS

A petition for discipline was filed against respondent on June 24, 1987. The first charge of the petition alleged that respondent had violated seven disciplinary rules by his conduct in handling the no-fault insurance proceeds for his client, [A]. The petition alleged that respondent endorsed and negotiated various drafts payable to [A] without the authorization of [A], that he deposited the proceeds in accounts in which his general office funds were also deposited, that he failed to make appropriate disposition of funds as requested by his client, that he neglected a legal matter through his failure to disburse funds in his possession, and that he appropriated client funds to his own use by allowing his accounts to fall below the amount of the entrustment.

Charge II of the petition alleged that respondent had violated five disciplinary rules by engaging in conduct similar to that alleged in charge I. This charge involved the funds of four clients.

The disciplinary rules allegedly violated in both charges are as follows:

(A) D.R. 1-102(A)(4), prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation;

(B) D.R. 6-101(A)(3), prohibiting a lawyer from neglecting a legal matter entrusted to him;

(C) D.R. 9-102(A), requiring the proper maintenance of a trust account for entrusted funds of clients;

(D) D.R. 9-102(B)(3), requiring a lawyer to maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and to render appropriate accounts to his client regarding them.

(E) D.R. 9-102(B)(4), requiring a lawyer to promptly pay or deliver to the client, as requested by the client, the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

The two additional disciplinary rules allegedly violated in charge I are as follows:

(A) D.R. 2-106(A), prohibiting a lawyer from entering an agreement for, charging, or collecting an illegal or clearly excessive fee;

(B) D.R. 9-102(B)(1), requiring a lawyer to promptly notify a client of the receipt of the client's funds, securities, or other properties.

Respondent, by his counsel, filed an answer to the petition for discipline on July 24, 1987. In the answer, respondent alleged that he had an oral fee agreement with [A] and thereby believed that he' had authority to negotiate checks payable to [A]. Respondent alleged further that he had negotiated the checks on account of legal fees and costs.

In response to charge II, respondent filed a motion to dismiss. In support of the motion respondent

claimed that the investigatory hearing was conducted for charge I and that the attorney-client privilege prohibited him from testifying regarding any clients other than [A]. Respondent also claimed the Fifth Amendment privilege against self-incrimination in support of the motion to dismiss. Respondent argued that petitioner may not conduct a random audit of an attorney's bank accounts to support disciplinary charges when the clients whose funds are held in those accounts have not complained to the disciplinary authorities.

The matter was referred to Hearing Committee [ ] consisting of [ ]. Hearings were held on October 20, 1987 and January 15, 1988.

The report of Hearing Committee [ ] was filed on July 19, 1988. The hearing committee found that respondent had violated all seven disciplinary rules as charged in the petition for discipline. These violations were found with respect to the respondent's handling of the funds of [A], [B], and [C]. A chargeable case was not found relating to the funds of [D] and [E]. The motion to dismiss charge II was denied and respondent's objections to the admission of the bank records relating to charge II were overruled.

The hearing committee concluded that respondent was not authorized to negotiate the drafts and he knew he did not have authorization. Noting the lack of mitigating circumstances and the duplicitous nature of respondent's conduct, the hearing committee recommended a one-year suspension.

Petitioner's brief on exceptions was filed on August 25, 1988. Petitioner excepted on two issues. First, petitioner argued that there is clear and convincing evidence on the record to support additional findings of fact. Proposed additional findings were appended to the brief. Secondly, petitioner argued

that the discipline recommended by the hearing committee would be inadequate and that disbarment or suspension well in excess of one year is warranted by this matter. Petitioner presented several cases in support of the recommended discipline and argued that there are no mitigating circumstances in this matter but that there are aggravating circumstances.

Respondent's brief on exceptions was filed August 25, 1988. Respondent excepted to the hearing committee report on four grounds. Respondent argued first that the hearing committee erred in finding that respondent had no authority from [A] to endorse the no-fault checks. Secondly, respondent argued that the no-fault statute should be construed in such a manner that respondent's retention of the no-fault checks for fees and costs was not in violation of that statute. The third exception was to the failure of the hearing committee to dismiss charge II for petitioner's failure to follow board rules and procedures. Finally, respondent argued that the hearing committee erred in recommending discipline greater than public censure. Respondent requested oral argument before a panel of the board.

Petitioner answered each of respondent's arguments in a brief opposing exceptions that was filed on September 13, 1988.

A three-member panel of the board heard oral argument on October 7, 1988. The matter was adjudicated at the October 11, 1988 meeting of the board.

## FINDINGS OF FACT

(1) Respondent, [   ], was born in 1948, admitted to practice law in the Commonwealth of Pennsylvania in 1976, and his office is located at [   ].

## *Charge I*

(2) In about April 1982, respondent was retained by [A] to recover certain basic loss benefits from [A's] insurance carrier, [F] Insurance Company.

(3) There was neither a written nor an oral fee agreement between respondent and [A] for respondent's services regarding no-fault recovery.

(4) Respondent advised [F], [A's] Insurance Carrier, that he represented [A] and requested wage loss benefits and reimbursement of various medical expenses.

(5) Between August 1982 and December 1982, respondent received from [F] and forwarded to [A] at least three drafts payable to [A], totalling $1,076.76.

(6) Respondent received draft no. 758039, dated February 22, 1983, from [F], payable to [A], in the amount of $253.30 for reimbursement of medical expenses. Respondent informed [A] of receipt of the draft and requested written authorization from [A] to cash the draft, to deduct an unspecified amount for costs and expenses, and to remit the balance to [A]. [A] did not respond, nor did he agree, expressly or implicitly, to permit respondent to negotiate this draft.

(7) Respondent was not authorized by [A] or anyone else at any time thereafter to negotiate and/or endorse any drafts made payable to [A].

(8) By letter to [A] dated February 28, 1983, respondent forwarded draft no. 758039, dated February 22, 1983, in the amount of $253.30 and requested payment of $241 for "legal fees due on the no-fault claim, plus expenses." The non-itemized fees were billed at $166 and the remaining $75 was requested for reimbursement for the costs of a report of Dr. [G].

(9) By letter from [F] dated March 24, 1983, respondent received draft no. 760667 in the amount of $289.46, payable to [A], $250 of which was for billed services performed by [H], M.D., the remainder representing reimbursement for prescription expenses.

(10) Respondent did not inform [A] of receipt of this draft, but, without authorization, endorsed the draft, "[A] by attorney, [respondent]," and deposited it into his [I] Natonal Bank attorney-at-law account.

(11) This attorney-at-law account was not a segregated account of client's funds.

(12) Respondent did not thereafter use the proceeds of the draft to satisfy the debt owed to Dr. [H] or forward the prescription reimbursement to [A].

(13) Thereafter, the attorney-at-law account balance repeatedly fell below the amount of $289.46.

(14) By letter dated May 11, 1983, respondent forwarded to [F] billing statements from [J] Medicine Services, totalling $60 and a bill from Dr. [H] in the amount of $433.

(15) On or about May 23, 1983, respondent received draft no. 784618 from [F] in the amount of $243, payable to [A], representing $183 for services performed by Dr. [H] ($433 less the $250 previously reimbursed on a prior bill) and $60 for [J] Medicine Services.

(16) Respondent failed to inform [A] of receipt of this draft, ultimately negotiated the same without authority and deposited it into his attorney-at-law account. Respondent did not thereafter use the proceeds to satisfy the debts owed by [A] to Dr. [H] and [J] Medicine Services.

(17) Upon deposit of the $243 to respondent's attorney-at-law account, the amount of [A's] funds for which respondent was accountable totalled

$532.46, and the balance in that account frequently fell below that amount, beginning May 31, 1983.

(18) By letter to [F] dated June 21, 1983, respondent acknowledged receipt of draft no. 784618 ($243), but informed [F] that his records did not reflect full payment for Dr. [H's] bill. Respondent also requested payment of $1,248 for Dr. [K's] charges, plus a $200 reimbursement for Dr. [L].

(19) By letter dated July 6, 1983, [F] informed respondent that they had remitted payment in full for Dr. [H's] bills, and enclosed three drafts: (a) in the amount of $1,248, payable to [A], for services rendered by Dr. [K]; (b) in the amount of $358 payable to [M] Health System; and (c) in the amount of $2,099.24 to reimburse [A] for lost wages.

(20) Respondent failed to inform [A] of his receipt of draft no. 808469 ($1,248) for Dr. [K], but, without authorization, endorsed the draft and deposited it into his attorney-at-law account. After that deposit the amount of [A's] funds for which respondent was accountable totalled $1,780.46 and the balance in the account thereafter continually fell below that amount.

(21) Respondent did not thereafter use the proceeds of this draft to satisfy the debt owed to Dr. [K].

(22) By a letter dated July 8, 1983, respondent informed [A] that he had paid [M] Health System and Dr. [K], when in fact he had not. With that letter respondent enclosed a bill for legal fees on the no-fault portion of his claim (in the amount of $380) and filing costs (in the amount of $63.75) for a total bill of $443.75. Respondent's computation of the fees due did take into account a set-off for any legal fees taken from draft nos. 760667 ($389.46) and 784618 ($243.00).

(23) By his check dated July 11, 1983, [A] paid respondent's bill in full, which check was negotiated by respondent on or about July 12, 1983.

(24) Respondent received a draft from [N] Insurance, dated November 1, 1983, in the amount of $15,000, made payable to "[A] and [respondent], Attorney," in full payment of the claim made by [A] against [O] and [P], the underlying action. Respondent again, without notifying [A], endorsed the check, "[A]" and "[respondent]," and on November 2, 1983 deposited the check into his escrow account.

(25) Respondent issued a check from his escrow account dated November 18, 1983, payable to "[A]" in the amount of $9,000, representing [A's] share of the [N] Insurance settlement.

(26) Respondent's escrow account was not used by him solely as a depository for client funds during the time period involved. Respondent often made deposits of personal funds into his escrow account.

(27) Respondent admits that, sometime in the fall of 1983, he became aware of a "problem" Dr. [H] had regarding non-payment of her bill. Despite the fact that he had already received drafts and had been informed by the carrier that the full amount had already been paid, he again submitted a claim to [F] for payment of Dr. [H's] bills in the amount of $433, stating that he had no record of its payment.

(28) Respondent did not thereafter contact Dr. [H] regarding this matter or remit the amount due to her.

(29) Respondent likewise did not inform [A] of Dr. [H's] prior inquiry or instruct [A] to pay the bills.

### Charge II

(30) On June 8, 1983, respondent deposited into his attorney-at-law account [F] draft no. 782412 in the amount of $770, payable to "[B] and [respondent], her attorney" which draft was annotated "for

PIP Medical Expenses of [B]" and was for payment of a bill from Dr. [K].

(31) The draft was ultimately deposited in respondent's attorney-at-law account, but respondent did not pay Dr. [K's] bill for [B] until January 16, 1984.

(32) Beginning on October 13, 1983, the balance in respondent's attorney-at-law account repeatedly fell below the amount of $770.

(33) By letter dated December 9, 1983, respondent falsely represented to Dr. [K] that [B] had received the draft to pay his bill on June 6, 1983 and that he had instructed her to pay Dr. [K's] bill.

(34) On March 11, 1983, respondent deposited into his attorney-at-law account draft no. N172546 issued by [Q] Insurance Group, in the amount of $1,500 payable to "[C] and [respondent], Attorney at Law."

(35) The draft was annotated "for release of and payment of all claims against [R] and [S] arising out of 8-13-82 accident, our claim no. [ ]."

(36) By his attorney-at-law account check (no. 2181) dated March 11, 1983, which cleared on March 15, 1983, respondent disbursed $900 to [C].

(37) On September 7, 1983, respondent deposited into his escrow account draft no. 54-A014687, issued by [N] Insurance, in the amount of $962, payable to "[C] c/o [respondent]," which draft was endorsed only "[respondent]."

(38) From September 7, 1983 through December 12, 1983, respondent was accountable for $962 to [C], during which period the balance in the attorney-at-law and escrow accounts each fell below this amount.

(39) On December 8, 1983, respondent disbursed $500 to Dr. [K] on behalf of [C] from his at-

torney-at-law account. The check cleared respondent's account on December 12, 1983.

(40) From December 12, 1983, through April 30, 1986, respondent was accountable for $462 to [C], during which period the balances in the attorney-at-law and escrow accounts each fell below this amount.

## CONCLUSIONS OF LAW

(1) The board finds that the respondent did violate Disciplinary Rule 1.102(A)(4), dealing with conduct involving dishonesty, fraud, deceit and misrepresentation when he forged his clients' name to the various checks involved, failed to pay the monies to his clients or on behalf of his clients in a timely manner and misrepresented such facts to his clients.

(2) The board finds that respondent violated Disciplinary Rule 9-102(A), dealing with the proper maintenance and use of a lawyer's trust account for entrusted funds of his clients, by failing to maintain such account for the proceeds of the no-fault drafts and in commingling his own funds with his clients' funds in an established escrow account.

(3) The board finds that the respondent did violate Disciplinary Rule 9-102(B)(1), dealing with the lawyer promptly notifying a client of receipt of the client's funds, securities, or other properties, when, on multiple occasions, he received drafts for or on behalf of his clients and failed to properly notify them of the existence of those funds in his possession.

(4) The board finds that respondent did violate Disciplinary Rule 9-102(B)(3), dealing with a lawyer maintaining complete records of all funds, securities, and other properties of the client coming into the possession of the lawyer and the rendering of an

appropriate account to his clients, in that respondent, if believed, failed to keep accurate records of the monies received on behalf of his clients and failed to account to the physicians of the clients for which the funds were forwarded.

(5) The board finds respondent did violate Disciplinary Rule 9-102(B)(4), dealing with the prompt payment or delivery to a client, as requested by the client, the funds, securities, or other properties in possession of the lawyer which the client is entitled to receive, in that respondent did retain the funds paid to his client or paid on behalf of his client for an extended period of time in accounts which were under his control and available for his benefit.

## DISCUSSION

This matter involves the oft-repeated scenario in which an attorney has handled the funds of a client in a questionable fashion. In addition to mishandling of client funds this matter also involves the question of the proper collection of a fee in a no-fault case as well as the procedural practice of bootstrapping additional charges to an original charge based on evidence turned up while investigating the original charge.

Respondent engaged in shoddy practices when it came to billing clients and handling client funds. Respondent negotiated no-fault checks, received on behalf of [A], without the actual consent of [A]. He believed that he had [A's] implied authority for this practice but could point to nothing that supported his belief. Respondent delayed payment of his clients' medical expenses, in some cases for an extremely long period of time, and misrepresented to his clients that the medical expenses had been paid. Respondent withheld two no-fault checks as pay-

ment of fees and costs but later billed [A] for the services provided. [A] and respondent were both confused by respondent's billing practices.

More important, however, is respondent's commingling of his client's funds with his office funds. Even when respondent placed funds in the escrow account those funds were not segregated because at times respondent placed his own funds in the escrow account. The proceeds of the no-fault checks should have been placed in an escrow account. Instead respondent placed those funds in his attorney-at-law account and allowed that account to fall below the entrusted amount.

The practices of respondent indicate that he failed to properly handle funds of clients that were entrusted to him. It is evident that respondent did not maintain accurate records of client funds that came into his possession and that he failed to properly account for those funds. In the [A] matter respondent failed to notify [A] of the receipt of the funds payable on behalf of [A]. Finally, respondent also made misrepresentations to his clients.

Despite the commingling of funds, it is apparent that respondent did not intend to steal money belonging to his clients or their doctors. He took shortcuts in negotiating the drafts and failed to hold the funds inviolate but he did not pocket the funds strictly for personal use. Respondent did allow his attorney-at-law account to fall below the entrusted amount of client funds but this was not an attempt to steal those funds. In the end the clients and their doctors received what was owed to them, granted with extreme delay and with the embarrassment to his clients of being pursued by collection agencies.

Respondent was charged with collecting an illegal fee by retaining the two no-fault checks as payment for fees and costs. Petitioner alleged that

the collection of a fee in this manner was in violation of 40 Pa.C.S. §1009.107, prohibiting an attorney from applying no-fault benefits due a client to the attorney's fee for representing the claimant in an action for overdue no-fault benefits. In support of this position petitioner cited *Office of Disciplinary Counsel v. Lewis,* 493 Pa. 519, 426 A.2d 1138 (1981). In that case the attorney was disbarred for, among other things, collecting a 50 percent contingency fee from no-fault benefits due his client.

The *Lewis* case is distinguishable from this matter, however, in that Lewis charged a contingency fee rather than a fee based upon the amount of time expended. A fee based upon the time expended is clearly allowed in a no-fault action. Respondent charged his fee on a time expended basis. Moreover, the prohibition in the no-fault statute is with regard to overdue benefits only. See 40 P.S. §1009.107 (now repealed). Respondent was not collecting overdue benefits. The board concludes that respondent did not charge an illegal fee because the applicable no-fault statute does not prohibit an attorney from taking a fee out of no-fault proceeds as long as the fee was based upon actual time expended.

Respondent has maintained throughout these proceedings that charge II of the petition for discipline was improperly brought against him. Respondent objected to the fact that charge II was based upon evidence found during what respondent termed as a random audit of his bank accounts in furtherance of the investigation of the [A] matter. Respondent was of the position that the "random audit" was improper without a complaint by clients other than [A] and that, if proper, charge II should have been brought under a separate docket number after a separate investigatory hearing.

Bringing charge II as a separate matter would have been more appropriate. Bringing charges based on subsequently discovered evidence to bolster an otherwise weak case could deprive the accused attorney of the disciplinary proceedings that are due the attorney, especially if the charges are brought in such a manner that the attorney does not have an adequate opportunity to respond and defend.

In the matter at hand respondent was not deprived of procedural due process by the inclusion of charge II in the petition for discipline. The evidence to support charge II was discovered pursuant to a valid subpoena of respondent's bank records limited to the time of the [A] matter. When potential violations of the disciplinary rules were discovered during the [A] investigation, petitioner had a duty to pursue those potential violations.

The new charges were presented at the investigatory hearing on charge I. This afforded respondent the entire range of disciplinary proceedings. Respondent was adequately informed that these new charges were to be taken up at the investigatory hearing but respondent, on the advice of counsel, objected to this procedure and chose not to answer these charges. Furthermore, respondent was not prohibited from testifying by Canon 4, as he claimed, because D.R. 4-101(C)(4) permits an attorney to reveal confidences or secrets to defend against accusations of wrongful conduct.

In situations where an attorney would be deprived of procedural due process by the bootstrapping of additional charges separate disciplinary proceedings must be initiated. But when, as here, the bootstrapping technique does nothing to deprive the attorney of procedural due process the board will not prohibit the procedure. As stated by

petitioner, section 89.1 of the disciplinary board rules provides that proceedings will not be held invalid by reason of a non-prejudicial irregularity.

This was a case of poor office practices and poor judgment rather than an intentional effort to permanently convert client funds for personal use. Respondent obtained the no-fault proceeds on behalf of his client and eventually turned the funds over to the proper individuals. Likewise, the no-fault statute does not under the facts of this case prohibit the receipt of a fee from the no-fault payments received from the insurance carrier. Respondent is correct that the cases cited by petitioner involve violations of statutes or other aggravating circumstances not present in this matter. Respondent's lack of a prior disciplinary record weighs in his favor on the issue of appropriate discipline.

## RECOMMENDATION

In light of the foregoing findings and discussion, the disciplinary board recommends that respondent, [       ], be suspended from the practice of law for a period of one year. The board recommends further that, pursuant to rule 208(g), Pa.R.D.E., respondent be directed to pay the necessary expenses incurred in the investigation and prosecution of this proceeding.

Mr. Schwartzman and Mr. McGinley did not participate in the adjudication.

## ORDER

And now, December 28, 1988, upon consideration of the report and recommendations of the disciplinary board dated November 23, 1988, it is hereby ordered that [respondent] be and he is suspended from the bar of this commonwealth for a period of

one year, and he shall comply with all the provisions of rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the disciplinary board pursuant to rule 208(g), Pa.R.D.E.

Mr. Justice Papadakos did not participate in this matter.