## Office of Disciplinary Counsel v. Corcoran

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

Disciplinary Docket no. 74 DB 2009.

LAWRENCE, *Member*, June 22, 2010—Pursuant to rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania ("Board") herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On May 18, 2009, Office of Disciplinary Counsel filed a petition for discipline against Richard M. Corcoran. The petition charged respondent with violations of the Rules of Professional Conduct and Rules of Disciplinary Enforcement arising out of allegations that respondent engaged in misconduct in three separate matters. Respondent filed an answer to petition on June 30, 2009.

A disciplinary hearing was held on October 1, 2009, before a District IV hearing committee comprised of Chair Edwin W. Smith, Esquire, and members David S. Posner, Esquire, and Henry M. Casale, Esquire. Respondent represented himself.

The hearing committee filed a report on February 12, 2010 and concluded that respondent violated the rules as charged in the petition for discipline. The committee recommended that respondent be disbarred from the practice of law.

No briefs on exception were filed by the parties.

This matter was adjudicated by the disciplinary board at the meeting on April 14, 2010.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

1. Petitioner, whose principal office is located at Pennsylvania Judicial Center, 601 Commonwealth Ave., Suite 2700, P.O. Box 62485, Harrisburg, Pennsylvania, is invested pursuant to Rule 207of the Pennsylvania Rules of Disciplinary Enforcement, with the power and the duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings in accordance with the various provisions of the aforesaid rules.

2. Respondent is Richard M. Corcoran. He was born in 1967 and was admitted to practice law in the Commonwealth of Pennsylvania in 1995. His attorney registration address is 106 N. Center St., Ebensburg, Pa. 15931. He is subject to the jurisdiction of the disciplinary board of the Supreme Court of Pennsylvania.

3. Respondent has a record of prior discipline consisting of an informal admonition administered in 2005 for violations of RPC 1.3,1.4(a) and 8.4(d).

4. Since 2006, respondent has been a sole practitioner and has worked part-time for the public defender's office in Cambria County.

*Charge I*

5. As of May 26, 2005, respondent was representing Kathryn Griffiths (formerly Weber) in a divorce action filed on her behalf against Richard Weber, in the Court of Common Pleas of Mercer County.

6. By order of May 26, 2005, Judge Christopher J. St. John ordered that the sum of $1,687.50 be paid by Mercer County to attorney John Regule, the court-appointed master, for his service in the Weber divorce action.

7. Pursuant to that order the prothonotary of Mercer County paid $1,687.50 to Mr. Regule.

8. By order of August 14, 2006, concerning the Weber action, Judge St. John directed in part, that:

a. the escrowed monies from the sale of the marital residence and personal property being held by respondent in escrow shall be distributed with the balance of master's fees and costs paid first from the proceeds;

b. respondent was required to contact the prothonotary's office to secure the total amount owing; and

c. the balance of the escrowed proceeds be divided equally between the parties.

9. On September 7, 2006, respondent deposited into his IOLTA account at Ameriserv Financial, the proceeds of a check in the amount of $31,108.72 issued by attorney Dennis Govachini and annotated "*Weber v. Weber Escrow account.*"

10. The check represented the proceeds for the sale of the Webers' marital residence and personal property, which had been held in Attorney Govachini's IOLTA account.

11. Respondent did not pay any funds to the Mercer County prothonotary for the master's fees and costs as

ordered by the court.

12. Respondent commingled the fees owed to him from the client with the amounts held in the IOLTA account.

13. After the above check cleared, on September 22, 2006, respondent was entrusted to hold in his IOLTA account at least $1,956.50 on behalf of Ms. Weber and Mr. Weber, representing the balance of the marital property proceeds.

14. As of September 27, 2006, respondent was representing Douglas Lidwell in a divorce action against Mary Ann Lidwell, in the Court of Common Pleas of Cambria County.

15. On September 27, 2006, respondent deposited into his IOLTA account the proceeds of a check in the amount of $14,336.15 issued to him by Mr. Lidwell.

16. Mr. Lidwell provided respondent with the $14,336.15 so he could pay those funds to attorney Robert Petyak, Mary Ann Lidwell's attorney, pursuant to a court-approved master's report as part of the resolution of equitable distribution in the divorce.

17. As of September 27, 2006, respondent was entrusted to hold in his IOLTA account at least $16,292.65: $1,956.50 on behalf of Ms. Weber and Mr. Weber and $14,336.15 on behalf of Mr. Lidwell and Ms. Lidwell.

18. According to the master's report, the Lidwells were to cooperate in executing any and all documents necessary for the transfer of assets to the parties and the division of the assets was to be accomplished within 45 days of

the request of the other party to execute the necessary documents.

19. In a letter to respondent dated October 2, 2006, attorney Petyak stated that he and Ms. Lidwell were making a formal request that Mr. Lidwell execute all documentation and respondent's client had 45 days.

20. The $14,336.15 should have been paid by respondent to attorney Petyak on behalf of Ms. Lidwell in December 2006.

21. Respondent did not pay attorney Petyak the monies due Ms. Lidwell in December 2006 because he did not have the funds to do so.

22. On about November 7, 2006, the law firm of Goldberg, McCafferty & McKeever in Philadelphia sent respondent and his wife, Michelle Corcoran, a notice that it was attempting to collect a debt owed to Washington Mutual, its client, in the amount of $14,134.54. This amount was necessary in order to make respondent's mortgage current and respondent was informed that unless he paid this amount, a sheriff's sale was scheduled on respondent's residence on December 8, 2006.

23. On November 8, 2006, at respondent's request, Ameriserv Financial wire transferred $14,134.54 from respondent's IOLTA account to an account at First Trust Bank in Philadelphia on behalf of the Goldberg firm to prevent the Corcoran residence from being sold at the sheriff's sale. Ameriserv also charged respondent a $25 wire fee for the transfer.

24. Respondent did not have the authority or consent

of Mr. Weber and Ms. Weber, Mr. Lidwell and Ms. Lidwell or attorney Petyak on Ms. Lidwell's behalf to use any of the $14,134.54 from respondent's IOLTA account to pay respondent's personal mortgage obligation and had no knowledge that respondent did so.

25. After the wire transfer was made and the wire transfer fee was charged, the balance in respondent's IOLTA account was out of trust.

26. From November 8, 2006 through April 12, 2007, the balance in respondent's IOLTA account was less than $16,292.65, with the lowest balance being $1,519.28 from March 27 through March 30 and April 10 through April 12, 2007. This was $14,773.37 less than the amount entrusted to respondent on behalf of the Webers and the Lidwells.

27. On about January 26, 2007, attorney Petyak, on behalf of Ms. Lidwell, filed a petition for contempt against Mr. Lidwell in part because respondent did not pay Ms. Lidwell the $14,336.15 she was entitled to receive from the amount that had been entrusted to respondent in his IOLTA account.

28. A hearing on the petition for contempt was held on March 5, 2007, at which respondent, Mr. Petyak, and the Lidwells were present. At that time, respondent told Judge F. Joseph Leahey, in part, that:

a. Mr. Lidwell would pay Ms. Lidwell the $10,000 by certified check and an additional $500 to pay Mr. Petyak for attorney's fees within 30 days;

b. Within that time, Mr. Lidwell would pay Ms. Lidwell the "cash value" of the life insurance policy, which was $4,336.15.

29. On March 5, 2007, the balance in respondent's IOLTA account was $2,413.56.

30. At the conclusion of the contempt hearing, Judge Leahey stated that the colloquy as referenced in the transcript would be entered as an order of court and if the order was not complied with the parties could be found in contempt.

31. When respondent did not pay the $14,336.15 to Ms. Lidwell and the $500 to Mr. Petyak within the agreed upon 30 days, Mr. Petyak filed a second petition for contempt against Mr. Lidwell on April 13, 2007.

32. Based upon the second petition for contempt, Judge Leahey issued an order, dated April 16, 2007, directing, in part, that:

a. A rule was issued upon Mr. Lidwell to show cause why he should not be held in contempt of court for failing to pay the $14,336.15 to Ms. Lidwell and the $500 to Mr. Petyak;

b. Mr. Lidwell was directed to file an answer to petition within 20 days;

c. If no answer was filed by the return date, the court may make the rule absolute and hold Mr. Lidwell in contempt; and

d. The rule was returnable and a hearing was scheduled for May 9, 2007.

33. On May 4, 2007, respondent hand-delivered to Mr. Petyak a check dated May 4, 2007, drawn on his IOLTA account, in the amount of $14,836.15, made payable to

Mr. Petyak as attorney for Ms. Lidwell.

34. Along with that check, respondent hand-delivered his May 4, 2007 cover letter to Mr. Petyak, in which he stated that as the check was enclosed, the hearing set for May 9, 2007 could be cancelled.

35. When respondent gave Mr. Petyak the check, there were insufficient funds in his IOLTA account for that check to clear.

36. As of May 8, 2007, respondent was representing Denise Polites in a divorce action against Paul Polites, in the Court of Common Pleas of Cambria County.

37. In March 2007, criminal charges of simple assault, harassment, and disorderly conduct were pending against Mr. Polites regarding his conduct toward Mrs. Polites.

38. Respondent and counsel for Mr. Polites came to an agreement that Mrs. Polites would not press charges against Mr. Polites if he agreed to pay Mrs. Polites $4,000 for medical bills relating to injuries she sustained as a result of Mr. Polites' conduct.

39. Mr. Polites agreed that $3,000 would be paid to respondent on behalf of Mrs. Polites and the remaining $1,000 would be made available when criminal charges were dismissed against Mr. Polites.

40. On May 8, 2007, as part of a total deposit of $4,925.50, respondent deposited $3,000 into his IOLTA account on behalf of Mrs. Polites.

41. The check in the amount of $3,000 was dated March 13, 2007 and was signed by attorney Kevin Persio,

and was drawn on his law firm's trustee account and made payable to respondent as attorney for Mrs. Polites.

42. Respondent received the proceeds of the $3,000 check.

43. Respondent did not pay the $3,000 to Mrs. Polites.

44. Mrs. Polites repeatedly asked respondent when she would receive the proceeds of the $3,000 check.

45. Although respondent deposited the proceeds of the $3,000 check into his IOLTA account on May 8, 2007, respondent misrepresented to Mrs. Polites on each occasion that he had not yet received the monies.

46. In November 2007, Mrs. Polites again contacted respondent to inquire as to the status of the $3,000.

a. Respondent misrepresented to Mrs. Polites that he had not received the $3,000;

b. Mrs. Polites informed respondent that Mr. Polites told her that he paid the check in March 2007 and Mr. Polites had given her and her son a copy of the check;

c. Respondent then acknowledged that he had received the $3,000;

d. Respondent then misrepresented to her that the $3,000 was in his escrow account;

e. Respondent told Mrs. Polites to meet with him on Christmas Eve at his law office and he would provide her with a check; and

f. Mrs. Polites went to respondent's office on

Christmas Eve and respondent did not appear.

47. Respondent explained that he retained the $3,000 that was entrusted to him on behalf of Mrs. Polites and applied it to an outstanding balance due respondent for Mrs. Polites past legal fees.

48. Mrs. Polites did owe respondent an unspecified amount for past service.

49. Respondent did not have a fee agreement with Mrs. Polites that would have authorized him to retain any amount from the amount that was entrusted to him on behalf of Mrs. Polites; respondent never presented Mrs. Polites with a bill for past services; and respondent failed to inform Mrs. Polites that he had transferred the $3,000 to his private use as compensation for legal service he had provided to Mrs. Polites.

50. As of May 8, 2007, respondent was entrusted to hold $760 on behalf of his client Dana Pugh. Respondent retained this $760 as compensation for legal services even though he did not send Mr. Pugh a bill for his services or follow the appropriate procedure to transfer funds that he was maintaining in his IOLTA account to his private use as compensation for legal services that respondent provided to Mr. Pugh.

51. Respondent did not have the authority or consent of Ms. Weber and Mr. Weber, Mrs. Polites, or Mr. Pugh to use any of their funds entrusted to respondent for purposes other than for their benefit and they had no knowledge that he did so.

52. After respondent's check to Mr. Petyak cleared on May 9, 2007, respondent was entrusted to hold in his IOLTA account at last $5,716.50: $1,956.50 on behalf of Ms. Weber and Mr. Weber; $3,000 on behalf of Mrs. Polites; and $760 on behalf of Mr. Pugh.

53. On May 9, 2007, the balance in respondent's IOLTA account was $1,939.79, which was at least $3,776.71 less than the $5,716.50 entrusted to him on behalf of the Webers, Mrs. Polites and Mr. Pugh.

54. From May 9, 2007 through December 31, 2007, the balance in respondent's IOLTA account was less than $5,716.50, except for June 1 through June 21 and August 9 through August 15, due to unrelated deposits into his IOLTA account.

55. By order dated October 23, 2007 as to the Weber divorce action, Judge St. John ordered, in part, that:

a. Paragraph 13(a) of the court's order of August 14, 2006 is supplemented to provide that the master's fees and costs that are to be paid from the escrowed monies is in the amount of $2,006.25;

b. Plaintiff's counsel [respondent] shall pay the sum of $2,006.25 to the prothonotary of Mercer County as is provided in paragraph 13(a) within ten days of the date of this order; and

c. The prothonotary shall forward a copy of this order to Richard M. Corcoran, Esquire, counsel for plaintiff and to Joseph M. Joseph, counsel for the defendant.

56. Respondent received a copy of the order of October

23, 2007.

57. Respondent did not pay the Mercer County prothonotary the $2,006.25, or any portion thereof.

58. In late April 2008 the Pennsylvania Lawyers Funds for Client Security awarded and paid $2,006.05 to the Mercer County prothonotary based on Ms. Weber's claim filed with the fund.

59. Respondent has not paid $2,006.25 to the fund.

60. As of December 31, 2007, respondent was still entrusted with $5,716.50 on behalf of the Webers, Mrs. Polites and Mr. Pugh.

### Charge II

61. On April 9, 2003, Kathryn Weber retained respondent to represent her in the ongoing divorce action filed on her behalf against Richard Weber in the Court of Common Pleas of Mercer County. The above findings of fact reference this action.

62. Although respondent had not represented Ms. Weber before, he did not communicate to her in writing the basis of that representation or inform Ms. Weber of his fee before or within a reasonable time after commencing the representation.

63. According to Ms. Weber, the primary dispute in the equitable distribution of marital property was whether a wrongful death case settlement in the amount of $250,000 that was paid to her husband was a marital asset and if so, what portion was due to Ms. Weber.

64. At Ms. Weber's first meeting with respondent, he showed her legal precedent that he advised supported her claim that the settlement was a marital asset.

65. By May 15, 2003, Ms. Weber had paid respondent his required $1,000 retainer fee.

66. Respondent entered his appearance on behalf of Ms. Weber on June 11, 2003.

67. On March 1, 2005 the master's hearing was held.

68. On May 26, 2005, the master submitted his report to the court and sent a copy to respondent.

69. The master ruled that while the death benefit was a marital asset, Ms. Weber was only entitled to receive $5,000 of this benefit.

70. Ms. Weber requested that respondent file exceptions to the report and respondent agreed to do so.

71. Respondent did not file the exceptions until June 7, 2005, which was one day after the ten-day time limit.

72. Respondent did not file a brief in support of the exceptions.

73. By an order dated September 6, 2005, Judge St. John directed that respondent obtain a transcript of the master's hearing and provide it to the court.

74. Respondent did not provide Judge St. John with a transcript of the master's hearing.

75. On April 7, 2006, Ms. Weber met with respondent about her divorce. At that time, respondent told her that he had papers for her to sign so the divorce could be finalized,

and assured her that when the decree was entered the issue of equitable distribution would continue.

76. By order of April 19, 2006, Judge St. John:

a. dismissed the exceptions as untimely filed;

b. stated that a local rule required that a brief be filed, but respondent did not do so;

c. directed that as a sanction for ignoring the local rule, the court denied oral argument to Ms. Weber and considered the issues that she raised as waived;

d. stated that respondent did not file the original transcript or provide a copy to the court as ordered; and

e. adopted the findings of fact and conclusions of law contained in the master's report.

77. On about May 18, 2006, respondent filed a notice of appeal with the Superior Court regarding Judge St. John's April 19, 2006 order.

78. By order of June 26, 2006, the Superior Court ordered that appellant comply with Rule of Appellate Procedure 3517, concerning the requirement that a docketing statement be completed and filed.

79. On July 7, 2006, respondent told Ms. Weber that he would not receive any substantive communication from the Superior Court concerning the appeal for "several months."

80. Respondent did not timely file the required

docketing statement.

81. By order of July 14, 2006, the Superior Court dismissed the appeal due to failure to comply with Rule of Appellate Procedure 3517, and ordered that respondent file a certification with the court within 10 days of the date of the order stating that the client had been notified of the entry of the order.

82. Respondent did not notify Ms. Weber of the Superior Court's order dismissing her appeal, and respondent did not file the required certification with the Superior Court.

83. Respondent sent to opposing counsel an August 1, 2006 letter that discussed concluding certain matters concerning the Weber divorce, including a disbursement of the monies held in escrow, and stated in the letter that if the final divorce decree was issued with the recommendations outlined by the master, the monies could be released.

84. Prior to sending the letter, respondent did not discuss concluding the equitable distribution issues with Ms. Weber.

85. After counsel for Mr. Weber filed the required documents with the prothonotary to finalize the divorce, a decree in divorce was issued on August 14, 2006.

86. The decree stated, in part, that the parties stipulated that the master's report and recommendation and proposed order become part of the decree in divorce, and the parties affirmed that the master's report and recommendation and proposed order were reaffirmed in their entirety.

87. The proposed order dated August 14, 2006, issued

by Judge St. John, included the divisions of marital property between the Webers.

88. Judge St. John issued an order dated August 28, 2006, which directed that the net proceeds from the sale of the Webers' marital residence be released to respondent and distributed in accordance with the court's August 14, 2006 order, with each party receiving one-half of the proceeds.

89. On September 7, 2006 respondent deposited into his IOLTA account the proceeds of the check in the amount of $31,108.72, issued by attorney Dennis Govachini, which represented the proceeds from the sale of the Weber's marital residence and personal property.

90. On September 13, 2006, respondent filed a notice of appeal with the Superior Court regarding Judge St. John's August 14, 2006 order.

91. During a meeting with Ms. Weber on September 13, 2006:

a.   Respondent told her that he had filed another appeal with the Superior Court;

b.   Ms. Weber believed that the first appeal was still pending;

c.   When Ms. Weber asked why he filed the appeal, respondent told her that he did so to cover all his bases, or words to that effect; and

d.   Respondent told her that the divorce decree was final on August 14, 2006.

92. Respondent did not tell Ms. Weber that the first Superior Court appeal had been dismissed.

93. Respondent gave Ms. Weber a billing statement for his legal services for the divorce action, dated September 14, 2006, and gave her a check for $8,351.61 for her share of the proceeds of the sale of the marital property.

94. Respondent's billing statement reflects that he charged Ms. Weber 2.25 hours for preparing a post-hearing proposal at $100 per hour; 1.75 hours for preparing a brief on March 12, 2006 at $100 per hour; and $1,000 for "Retainer for Appeal" despite the fact that:

a.   the brief reflected in this billing statement was not filed in a timely manner;

b.   respondent did not file the required documents for the appeal to the Superior Court and it was dismissed;

c.   the appeal was dismissed and respondent did not refund $1000 to Ms. Weber; and

d.   respondent did not give credit to Ms. Weber for the $1,000 she paid him as a retainer in 2003.

95. By letter of September 18, 2006, concerning the Weber divorce, respondent represented to opposing counsel that:

a.   the amount escrowed was $31,108.72 and of that sum "$1,587.50 was paid to the Prothonotary of Mercer County pursuant to the Master's Recommendations," leaving the balance of $29,521.22 to be disbursed evenly between the parties; and

b. he enclosed a check for $14,760.61 payable to him as attorney for Ms. Weber.

96. Respondent did not pay the prothonotary of Mercer County $1,587.50 or any portion thereof for the master's fees and costs.

97. By letter to respondent dated October 23, 2006, the deputy prothonotary of the Superior Court informed respondent that he needed to file a docketing statement and failure to do so would result in an order dismissing the appeal.

98. Respondent did not file the required docketing statement on behalf of Ms. Weber.

99. By order of November 6, 2006, the Superior Court dismissed the appeal and directed respondent to file a certification with the court within ten days that he notified his client of the entry of the order.

100. Respondent did not notify Ms. Weber of the dismissal of her appeal nor did he file the required certification with the Superior Court.

101. From about January 9, 2007 until at least mid-February 2007, Ms. Weber telephoned respondent on several occasions about her legal matter.

102. On each occasion, Ms. Weber was not able to speak to respondent and left a message.

103. Respondent did not return any telephone calls or otherwise communicate with Ms. Weber.

104. In February 2007, Ms. Weber learned on her own

that her appeals had been dismissed by the Superior Court and that the issue of equitable distribution of marital property had been concluded in August 2006.

*Charge III*

105. By letter dated September 18, 2007 sent by certified mail, Zygmont A. Pines, court administrator of Pennsylvania, informed respondent, in part, that:

a. He had not yet made the required payment of $175 or filed the required form for the assessment year ending June 30, 2008, which was due on or before July 1, 2007;

b. Rule 219(f), Pa.R.D.E., provided that if he did not complete the required form and submit the required fee with the late penalty of $100 within 30 days after date of notice, such failure would be deemed a request for transfer to inactive status and his name certified to the Supreme Court, which would immediately enter an order transferring him to inactive status; and

c. Rule 217, Pa.R.D.E., required him to notify his clients by registered or certified mail, return receipt requested, of his transfer to inactive status and consequent inability to act as an attorney after the effective date of such transfer.

106. The return receipt card reflected that the letter from Mr. Pines was received at respondent's law office on September 24, 2007.

107. Respondent failed to send the disciplinary board a completed annual fee form and payment in a timely

manner.

108. By letter dated November 15, 2007, Elaine M. Bixler, Secretary of the Disciplinary Board, informed respondent by certified mail that the Supreme Court had entered an order, dated November 15, 2007, transferring him to inactive status for failing to pay his annual assessment, effective on December 15, 2007.

109. Ms. Bixler's November 15, 2007 letter enclosed a copy of the Supreme Court Order, Rules of Disciplinary Enforcement, and other pertinent information.

110. Respondent admitted that he received Ms. Bixler's November 15, 2007 letter, but stated that he did not open the letter. Respondent submitted the unopened letter into evidence as "Respondent's Exhibit 1."

111. Respondent failed to give notice of his transfer to inactive status to all clients represented in pending matters, or litigation or administrative proceedings, and the attorney for each adverse party in litigation or proceedings by certified mail.

112. Respondent failed to file copies of notices and the return receipts with the Office of Secretary as required.

113. Within ten days after the effective date of the order, respondent failed to file the statement of compliance.

114. On December 15, 2007 respondent was transferred to inactive status pursuant to order of the Supreme Court.

115. However, on December 15, 2007 respondent remained employed as a part-time public defender by the Cambria County Public Defender's Office and also

maintained a private law practice.

116. On December 18, 2007, respondent engaged in the practice of law by representing a public defender client and two private clients in court appearances before Cambria County Common Pleas Court President Judge Gerald Long.

117. On December 20, 2007, respondent engaged in the practice of law by representing five public defender clients in court appearances in Cambria County.

118. On December 20, 2007, respondent engaged in the practice of law by representing a public defender client in Cambria County court.

119. Between December 26, 2007 and January 4, 2008, respondent engaged in the practice of law by representing private clients in court appearances and at hearings and by providing legal advice to clients.

120. Between December 18, 2007 and January 4, 2008, respondent did not inform the tribunal before which he was appearing, his clients, or opposing counsel that he had been transferred to inactive status and was unable to practice law.

121. On December 21, 2007, Lisa Lazzari, Chief Public Defender of Cambria County, questioned respondent about his transfer to inactive status.

122. A lawyer is not considered by the Disciplinary Board to be on active status until the board verifies receipt of the completed attorney's annual fee form, a check for the current license fee and any late fees, and an executed

statement of compliance has been received from the lawyer.

123. Respondent did not initiate the required formal action to be transferred to active status until December 26, 2007, when he claimed he sent the annual fee form and check to the board by means of expedited mail.

124. Suzanne E. Price, Attorney Registrar, did not receive respondent's information on Thursday, December 27, 2007 or Friday, December 28, 2007. The office of the secretary/attorney registration was closed on December 31 and January 1 for the New Year's holiday and Ms. Price did not return to work until January 7, 2008, following her vacation.

125. Between December 26, 2007 and January 7, 2008, respondent did not contact anyone at the office of secretary/ attorney registration to verify whether he had been placed on active status.

126. Between January 2 and January 4, 2008, Ms. Lazzari asked respondent whether he was still on inactive status and respondent replied to her that "everything was alright," or words to that effect.

127. January 2, 2008 was the earliest that respondent's annual fee form and check could have been received by the disciplinary board and he could have been considered by the board to be on active status.

128. Respondent was not administratively transferred to active status until January 7, 2008.

129. In his submission to the disciplinary board,

respondent certified that, pursuant to Rule 217(e), Pa.R.D.E., he had fully complied with the provisions of the Supreme Court's order, dated November 15, 2007, with the applicable provisions of the rules, and with applicable disciplinary board rules.

130. When respondent sent the executed statement of compliance to the board on December 26, 2007, he had not complied with the provisions of Rules 217(a),(b) and (c), Pa.R.D.E., which required that he provide notice to his clients and attorneys for each adverse party in litigation or administrative proceedings and all other required persons of his transfer to inactive status by certified mail and by filing the notices and return receipts with the office of secretary.

131. Respondent gave credible testimony at the disciplinary hearing.

132. When he opened his solo law practice in 2006 he had no secretary and by his own description he engaged in sloppy bookkeeping and his records were "horribly kept." (N.T. 59; 62)

133. Respondent's solo practice went from hectic to out of control and respondent felt constantly under pressure and allowed things to lapse. (N.T. 177)

134. Respondent admitted that he had no excuse for the misconduct and has learned a valuable lesson concerning the management of his law practice. (N.T. 66)

135. Respondent admits that his use of the $14,134.54 for his mortgage arrearages was an intentional act and he is extremely remorseful for it. (N.T. 69)

136. Respondent began consuming alcohol on a daily basis at a heavier rate than normal during the time frame of the misconduct. (N.T. 190)

137. Respondent has tried to stop drinking and has experienced relapses. He has contacted lawyers concerned for lawyers for advice and has attended Alcoholics Anonymous meetings, but does not currently do so. (N.T. 192, 194)

138. Prior to respondent's practice difficulties, he was involved in community activities, such as coaching sports and a mock trial team.

139. Respondent demonstrated recognition of his wrongdoing and sincere remorse.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following rules of professional conduct and rules of disciplinary enforcement:

1. RPC 1.3 - A lawyer shall act with reasonable diligence and promptness in representing a client.

2. RPC 1.4(a)(3) - A lawyer shall keep the client reasonably informed about the status of the matter.

3. RPC 1.4(a)(4) - A lawyer shall promptly comply with reasonable requests for information.

4. RPC 1.5(b) - When the lawyer has not regularly represented the client, the basis or rate of the fee shall be. communicated to the client, in writing, before or within a reasonable time after commencing the representation.

5. RPC 1.15(a) - A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a client-lawyer relationship separate from the lawyer's own property. Such property shall be identified and appropriately safeguarded. Complete records of the receipt, maintenance and disposition of such property shall be preserved for a period of five years after termination of the client-lawyer relationship or after distribution or disposition of the property, whichever is later.

6. RPC 1.15(b) - Upon receiving property of a client or third person in connection with a client-lawyer relationship, a lawyer shall timely notify the client or third person. A lawyer shall promptly deliver to the client or third person any property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

7. RPC 5.5(a) - A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.

8. RPC 8.4(c) - It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

9. RPC 8.4(d) - It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

10. Pa. R.D.E. 217(j)(4)(ii), (iv), (v), (vi) and (vii) - A

formerly admitted attorney may not engage in any form of law-related activities in this Commonwealth except in accordance with the following requirements: (4) Without limiting the other restrictions in this subdivision (j), a formerly admitted attorney is specifically prohibited from engaging in any of the following activities: (ii) performing any law-related services from an office that is not staffed by a supervising attorney on a full-time basis; (iv) representing himself or herself as a lawyer or person of similar status; (v) having any contact with clients either in person, by telephone, or in writing, except as provided in paragraph (3); (vi) rendering legal consultation or advice to a client, and (vii) appearing on behalf of a client in any hearing or proceeding or before any judicial officer, arbitrator, mediator, court, public agency, referee, magistrate, hearing officer or any other adjudicative person or body.

## IV. DISCUSSION

This matter is before the disciplinary board for consideration of charges against respondent that he misappropriated funds of clients, made misrepresentations to the court and his clients, neglected his clients' matters, engaged in the unauthorized practice of law while on inactive status, failed to comply with actions required of an attorney placed on inactive status, and filed a false certification with the disciplinary board.

In a disciplinary proceeding, petitioner bears the burden of proving that an attorney engaged in misconduct by a preponderance of the evidence that is clear and satisfactory. *Office of Disciplinary Counsel v. Surrick*, 561 Pa. 167, 749 A.2d 441 (Pa. 2000). Respondent admitted the majority

of the allegations that were contained in the petition for discipline prior to the commencement of the hearing and those admissions were introduced into evidence at the hearing. Based on the respondent's admissions and the evidence adduced at the hearing, the record demonstrates that petitioner has met its burden of proving respondent's misconduct by clear and convincing evidence.

Respondent committed serious misconduct in three matters. The most serious misconduct is the misappropriation and mishandling of client funds as described in charge I of the petition for discipline. Respondent used funds in his IOLTA account in order to pay the past due amount on his and his wife's mortgage in order to prevent their residence from being sold at a sheriff's sale. Respondent used these funds without consent of his clients. Respondent fully admits that his use of the funds was intentional. Respondent was entrusted with funds on behalf of clients, such as Ms. Weber and Mrs. Polites, and misused them when he did not hold them inviolate in his IOLTA account. At various occasions during the timeframe in question there were insufficient funds in his account to cover the entrusted amounts.

Additionally, respondent engaged in other acts of misconduct which negatively impacted his clients. On multiple occasions, respondent failed to keep his clients apprised of the status of their cases and engaged in misrepresentations to his clients. For instance, he continued to tell Mrs. Polites that he did not have her check for $3,000 when in fact it had been received and he had used it for past due legal fees. Respondent misled Ms. Weber as to the status of her appeals to the Superior

Court. Respondent failed to follow court procedures to the detriment of clients, as in his failure to timely file exceptions to a master's report, and his failure to file required docketing statements with the Superior Court.

Respondent engaged in the unauthorized practice of law for a short period of time after he was transferred to inactive status by the Supreme Court. Even though it was his sole and exclusive responsibility to take action to activate his license, he failed to immediately do so and continued to engage in the practice of law without notifying his employer and the court of his status.

As stated above, the most serious act of misconduct is the misuse of client funds. The Supreme Court has firmly stated that commingling and conversion of entrusted funds is a serious breach of public trust. *Office of Disciplinary Counsel v. Lewis*, 493 Pa. 519, 426 A.2d 1138 (Pa. 1981). Public discipline generally is the sanction imposed on attorneys who engage in this egregious form of misconduct, often a lengthy suspension or disbarment. *Office of Disciplinary Counsel v. Monsour*, 549 Pa. 482, 701 A.2d 556 (Pa. 1997); *Office of Disciplinary Counsel v. Lucarini*, 504 Pa. 271, 472 A.2d 186 (Pa. 1983).

Likewise, the court has made clear that practicing law while on inactive status is misconduct deserving of suspension, many times for at least one year and one day. An established line of cases reflects the court's position that filing the attorney fee form and paying the annual fee, in addition to complying with continuing legal education requirements, are not mere ministerial acts. An attorney has an affirmative duty to know the status of his or her

professional license and to comply with professional obligations. *Office of Disciplinary Counsel v. Peter W. DiGiovanni*, No. 26 DB 2008, No. 1468 Disciplinary Docket No. 3 (Pa. May 28, 2009); *Office of Disciplinary Counsel v. Harry Curtis Forrest, Jr.*, 72 Pa. D. & C. 4th 339 (2004) As with all disciplinary cases, the specific facts of each case dictate whether suspension is necessary and for how long, or whether private discipline is more appropriate. One of the facts that is critical is the length of time the attorney engaged in the unauthorized practice. Herein, respondent's unauthorized practice of law occurred during a very short time frame of approximately three weeks.

Respondent's additional acts of client neglect and misrepresentation compound the already serious nature of his misconduct and increase the level of discipline that must be imposed.

Determining appropriate discipline involves not only considering prior cases, but analyzing and weighing the aggravating and mitigating factors present in a matter. *Office of Disciplinary Counsel v. Foti*, 69 Pa. D. & C. 4th 278 (2003). It is an aggravating factor that respondent received an informal admonition in 2005. In that matter, respondent failed to file a brief to the Superior Court, failed to notify his client of the dismissal of the appeal and failed to file the required certification with the Superior Court. This appears to have been a warning sign that respondent did not heed.

In his favor, respondent admitted many of the allegations against him prior to the disciplinary hearing. He was a

candid witness at the hearing and expressed sincere remorse for his actions. He asserted his willingness to accept the ultimate discipline imposed by the court. Respondent detailed his beliefs that his poor office management and his heavy drinking contributed to his problems, but he did not try to excuse his misconduct. Indeed, while respondent gave credible testimony as to his alcohol use, we conclude that he did not present sufficient evidence for mitigation pursuant to the Braun standard. *Office of Disciplinary Counsel v. Braun*, 520 Pa. 157, 553 A.2d 894(Pa. 1989). Respondent's actions are unacceptable and demand that public discipline be imposed.

The hearing committee has recommended disbarment. The board's careful review of the record and case law suggests a different recommendation. Disbarment is reserved for the most egregious cases. *Matter of Renfroe*, 548 Pa. 101, 695 A.2d 401 (Pa. 1997). While there is no doubt that respondent's conduct is extremely serious, the board is persuaded by his candor and remorse that a lesser discipline will serve equally well to impress upon respondent the implications of his actions. The board is persuaded that a three year period of suspension will protect the public and allow respondent the opportunity to consider his actions.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, Richard M. Corcoran, be suspended from the practice of law for a period of three years.

It is further recommended that the expenses incurred in

the investigation and prosecution of this matter are to be paid by the respondent.

## ORDER

And now, September 20, 2010, upon consideration of the report and recommendations of the disciplinary board and dissenting opinion dated June 22, 2010, it is hereby ordered that Richard M. Corcoran is suspended from the bar of this commonwealth for a period of five years and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to rule 208(g), Pa.R.D.E.